## NATIONAL FOLDING–BOX & PAPER CO. v. ELSAS et al.

(Circuit Court of Appeals, Second Circuit. March 2, 1898.)

**1. PATENTS—INFRINGEMENT.**
A patent for a knock-down paper box, in which the flap constituting the locking device engages, straight edge to straight edge, with the slot in which it is inserted, is infringed by a box in which the slots, instead of being parallel with the vertical corner of the box, are inclined at an angle to it, and are also cut away at each side of the middle so as to give them a half-moon appearance, where the edges of the notched extension are made to correspond with the direction of the slot, so that, notwithstanding these changes, the edges engage straight edge to straight edge.

**2. SAME—MARKING "PATENTED."**
It is immaterial that complainant's device is marked with the dates of other patents besides that sued on, where such other patents are of no importance to the device described, or are without legal force.

**3. SAME—MEASURE OF DAMAGES.**
Where the infringement is of an entire new article of manufacture, the entire profits of which are attributable to the patented improvement, and where the measure of damages is necessarily determined by the losses of the complainant in its sales, the damages based upon a loss of the complainant's profit are not to be reduced by the deduction of a "manufacturer's profit."

**4. SAME—DOUBLE DAMAGES.**
Where defendants were deliberate infringers, having purchased their infringing goods after a preliminary injunction against them, and it appeared that their books had been sent out of the jurisdiction, to the embarrassment of the accounting, without any effort on their part to procure and produce them, *held*, that it was within the discretion of the circuit court to impose double damages.

**5. SAME—IMPROVEMENTS IN PAPER BOXES.**
The Ritter patent, No. 171,866, for an improved paper box, *held* not anticipated, valid, and infringed.

This is an appeal from a final decree of the circuit court for the Southern district of New York, which adjudged that the complainant was entitled to double damages for the infringement of claim 2 of letters patent No. 171,866, dated January 4, 1876, and issued to Reuben Ritter for an improved paper box. The litigation upon this patent commenced in the case of Box Co. v. Nugent, in which Judge Lacombe found upon final hearing that the defendants had infringed the second claim. 41 Fed. 139. In a subsequent case against the American Paper Pail & Box Company, Judge Lacombe granted an injunction pendente lite (51 Fed. 229), which order was affirmed by this court (1 U. S. App. 283, 2 C. C. A. 165). In the present case an injunction pendente lite was granted by Judge Lacombe, the case was heard upon final hearing by Judge Coxe (65 Fed. 1001), and the final decree was made by Judge Wheeler (81 Fed. 197).

Edmund Wetmore and Arthur v. Briesen, for appellants.
Walter D. Edmonds, for appellee.

Before WALLACE and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge (after stating the facts). The object of the invention was to make a broad, shallow box of stiff, coarse, and cheap strawboard from a single sheet of paper, without tacks and mucilage, which can be used for the carriage or storage of bulky

fabrics, such as ladies' dresses or suits of clothes. Before the invention, tubular paper boxes were used, the sides of which were permanently fastened together like those of an envelope, and when not in use could be collapsed, but were open at the ends, and were interlocked by hooks of the same material. The boxes of the patent in suit are known as "knock-down boxes," which are sent from the factory in an open, flat condition, and so remain until put into use. They are thus described by Judge Lacombe in the Nugent Case, supra, as follows:

"When put in use, their sides and ends are bent upwards, and flaps, projecting from the sides, are passed around the corners, and inserted into slots in the ends. There is thus formed a shallow rectangular box, with rectangular sides, which is held in shape without the use of rivets, mucilage, or any foreign substance. Paper boxes formed out of a single sheet of paper, and retaining their shape by an interlocking into slots of projection of their own material, were old. Plaintiff claims the application to such boxes, in combination with their shape. of the peculiar locking device described in his patent. The flap projection from the side strip is shaped thus (the dotted line representing the corner around which it is bent):

"The slot into which it is inserted is located in the end strip, perpendicular to the bottom of the box, and therefore parallel with the inner edge of the projection at the end of the flap. The slot is longer than the width of the flap which is to be thrust into it, and is located at such a distance from the corner that when the box is set up, and the flap thrust in. the projection of the latter will just pass within the box. The peculiar feature of this method of locking which complainant relies upon is the circumstance that the projection engages the straight edge of the projection with the straight edge of the slot; such engagement taking place sometimes at one point, sometimes at another, and sometimes, again, throughout the entire length of the projection. One supposed benefit derived from this peculiar mode of engagement is the securing of a greater degree of automatic adjustability, the box more readily accommodating itself to slight variations in the position of the parts relatively to each other, whether caused by imperfect cutting out of the blank or by carelessness in setting it up. This is said to be an important feature, in view of the fact that in such setting up the customer generally uses unskilled labor."

It is manifest from the character of the material which is and must be used in these boxes that, if the interlocking is by means of the pull of a lock upon the corner of the slot, the corner will be readily torn, and the box will become useless. In the patented lock the strain is distributed over the straight-edged surfaces of the retaining piece and of the slot, instead of being crowded into the end of the slot. It is also true that, because the side of the box which carries the hook or retaining piece rotates upon its hinge at the seam, the end of the straight-edge retaining piece is permitted to be inserted in the slot without danger of unduly bending and breaking that part of the lock. There was no other box of the kind in the market when it was first introduced, and it has gone into very extensive use. Upon the questions of anticipation and invention in view of the state of the art, the defendant introduced a number of patents. Three of them —one to Joseph P. Buckingham, No. 169,953, dated November 16, 1875, one to the patentee, No. 153,281, dated July 21, 1874, and a

French patent to Caussemille, issued June 2, 1869—were for knock-down paper boxes, but it is substantially admitted that each of them locked upon a different principle from that of the patent in suit. Two others described flexible envelopes, two described bale ties, and two described berry baskets. No one of these except the English patent to William Davis, dated January 21, 1868, to which the defendant attributes great importance, has any substantial bearing upon the questions in this case. The Davis patent was for a method of fastening paper bags or envelopes for the conveyance, by post or otherwise, of samples of grain or other articles, or to be used as receptacles for letters, and was an envelope closed on three sides, and having a projection or tongue upon the flap of the fourth side which tucked into a slot in the body of the envelope. It was a method of closing the mouth of a completed paper envelope. The retaining piece had what may be called a straight-edge projection, and an engagement took place between this straight edge and an edge of the slot. The defendants therefore assert with confidence that, inasmuch as the plaintiff's expert said that all that Ritter invented was his peculiar form of lock, adapted to a knock-down paper box, and inasmuch as Davis engaged straight edge with straight edge, a question of anticipation must be resolved in favor of the defendants. The counsel forgot that the expert's definition of the invention was, "Ritter's peculiar form of lock adapted to a knock-down paper box," or, as Judge Lacombe defined it, "The application to such boxes, in combination with their shape, of the peculiar locking device described in the patent." In the Davis envelope of flexible paper the projection could be doubled upon itself so as to enter the slot without breakage, but, if the envelope had been made of coarse strawboard, the attempt of the ordinary consumer to tuck the two parts together would have been practically useless. Therefore, in order to use the Davis projection in a strawboard box, it must be attached to some part which is so hinged that it can rotate backward, and enable the hook to be backed away, and thus avoid the strain from binding. If the capacity of the side of Ritter's box to be thrown backward is materially diminished, and the hook is required to be doubled upon itself, the capacity of the box for usefulness is practically destroyed.

It is next said that the improvement consisted in attaching the Davis tongue to the corner of the blank of the Buckingham box of 1875, and was, therefore, destitute of patentable invention. Claim 2 is for a combination, as follows:

"A box top consisting of the tops. f, f1, f2, f3 [the end of the box retaining the notched extension f4], connected together by notched extension, f4, passing through slots, f5 [in the corner of the said f2], in the manner and for the purposes described."

It is a familiar rule that where the thing patented is an entirety, the mere fact that the different elements are taken from different old devices or exhibits does not create conclusion of noninvention. Imhaeuser v. Buerk, 101 U. S. 647; Dederick v. Cassell, 9 Fed. 306. Although this is familiar, the same form of suggestion which was formerly used is still often pressed by a defendant, as though it necessarily had an important bearing upon the question of patentability. On this case it has no argumentative power, for that the com-

bination in a strawboard box was an inventive act seems self-evident when the history of the art has been read.

The question of infringement of the Ritter patent is, in the mind of the actual defendant, the one of importance in the case. It owns a patent, No. 377,640, dated February 7, 1888, issued to T. F. W. Schmidt, under which millions of boxes have been made since November, 1887, and by which it thinks infringement is avoided. The defendants' notched extension is somewhat curved in its central portion, instead of having the straight lines of the Ritter extension. It is true also, as the complainant's expert points out, that the slots of the patented device are parallel with the vertical corner of the box, while in the defendants' box the slots are inclined at an angle, but the edges of its notched extension also correspond exactly with the direction of the slot, and remain parallel with it. There is also in the defendants' box a cutting away of the portion of the paper at each side of the middle of the slot, so as to give it a half-moon appearance. No one of these changes alters the character of the locking device. The straight edges of the extension have their outward pull upon the sides of the slot, and do not bring up in its end or corner. The defendants' locking device is intentionally further off in appearance than the Nugent device was from the patented lock, but the result is the same, viz.: "When a pull comes, the straight edge of the thick cardboard composing the projection of the flap is brought up against the straight edge of the slot through which it was thrust." The mode of action in which the projection acts is the same with that of the Ritter lock and with a Nugent modification.

The next question is as to the proper rule of damages. In the careful and conservative report of the master he found that the entire profit in the box was due to the invention described and contained in the patent in suit, and that there was no testimony to the effect that any part of the profits arising from the manufacture and sale of the box according to the second claim of the patent is attributable to other inventions or improvements, or to other things than those expressly covered by that claim. The defendants seem to place stress upon the fact that some of the complainant's boxes have been marked with the dates of other patents besides that of the patent in suit. This solitary fact is of no importance if the patents are of no importance. The master truly found that none of the features described and claimed in the other patents, with one possible exception (in the Buckingham patent of 1877, No. 187,506), entered into the construction of the complainant's boxes, that this patent was without legal force, and that these possible features were fully covered by the patent in suit. In this patent of 1877, which is subsequent to the Ritter patent, diagonal slots were shown, and in the claims of the patent were mentioned in combination with other features of construction. Diagonal instead of vertical slots are used by the complainant, but the inventions of the claim are not used. Diagonal slots anteceded Ritter, and there was nothing patentable in them. No testimony on the subject of the Buckingham patent was given, except upon the defendants' cross-examination of the plaintiff's witness Munson, who testified in accordance with the master's findings. In view of these facts, discussion of the value of the Buckingham patent with respect

to an apportionment of profits seems superfluous, and that the whole profit on the Ritter box was due to this patent is also firmly established. The portion of the master's report which describes the difficulties which were thrown in the way of an estimate of the profits of the defendants, and the limitations which were placed upon his investigations, and which contains his findings in regard to the complainant's damages, is important. The defendants were in the habit of buying to some extent the product of the Dayton Paper Novelty Company, which is confessedly the real defendant in this case. The master says:

"The accounting is beset with difficulties, and has been prosecuted and contested with exceptional vigor. Much of the difficulty was caused by the absence of the business books and records of the defendants covering the period of infringement. They professed inability to make production upon the ground that all their books and papers had passed from their custody and control under a sale and transfer of the co-partnership to one Jacob Elsas, and a subsequent transfer by him to the Elsas Paper Company, of Pennsylvania. The facts as to such transfer as they appear in the testimony of defendant Elsas are as follows: On December, 1891, the defendants Elsas and Keller, for reasons satisfactory to themselves, agreed to sell all the firm property and assets to Jacob Elsas, who appears also to have assumed all the business liabilities. A formal transfer was made in January, 1892. Jacob Elsas proceeded to liquidate the co-partnership affairs, retaining defendant Elsas in his employ, to whom he gave a power of attorney. Later on, the Elsas Paper Company, of Pennsylvania, was formed, and the books, paper, property, and business were turned over to this corporation. Defendant Elsas was selected as its president, and he continued as the chief executive officer of this corporation until about January, 1895, when it went into liquidation, and established its office for that purpose in Atlanta, Georgia, to which place the books and papers in question were removed about May 1, 1895. It is supposed that these books and papers are there now. This suit was commenced in January, 1892, about the time of the dissolution of defendant's co-partnership and the transfer to Jacob Elsas. The decree was entered December 26, 1894, just preceding the liquidation of the Pennsylvania corporation. The books and papers were sent to Georgia about May 1, 1895, over four months after the account had been ordered, and five months, at least, before proceedings under the accounting were instituted before me. These facts do not warrant a finding that such books and papers were removed beyond the jurisdiction of the court because of the accounting; neither does the evidence justify a finding that the books and papers were within the power of the defendants to produce. It does appear, however, that the defendants did not exert themselves in the matter of production, doing nothing more than to write a letter, which was never answered. It does not appear that any explanation for ignoring this letter was sought, or any effort was made to ascertain whether such letter ever reached its destination. I am unable, from the evidence, to notice a finding that the defendants made a bona fide effort to produce or have produced on this accounting the books and papers in question. Such being the case, I am not persuaded that the complainant ought to suffer the entire consequences, and, in addition thereto, be charged with the costs and expenses of this accounting. I am convinced that the defendants made a substantial profit by their transactions in the infringing boxes over and above the business expenses properly chargeable thereto, the amount of which would have been disclosed by the books. But profits upon such accountings must be computed from the proofs, not guessed at, and the burden of furnishing the proofs rests upon the complainant." He further said: "Upon the question of damages, I am convinced from the proofs, and so find and report, that complainant and its predecessors possessed facilities of supply equal to the trade demand. I am not satisfied that there was any knock-down box in the market, other than the patented and infringing boxes, which fully satisfied the trade requirement. The patented box had been well introduced and was well known when the infringement began. The owners of the patent had been vigilant in its protection.

The defendants were well acquainted with its merits as a salable article, for they had been supplying it to their customers before they took up with the infringement, and they continued to do so for a long time thereafter. The infringing box was selected by them for their trade because it gave satisfaction equally as good, could be bought at better advantage, and possibly because the infringing manufacturers were a little more prompt in filling their orders. No special efforts seem to have been made by them or any one else to stimulate a demand for the infringement. They had been selling the patented box, and, as orders for knock-down boxes came in, the patented and the infringing box were sent for a time indiscriminately. This part of defendants' business practically ran itself. It is therefore to be presumed that, had the infringing box not been in the way, defendants would have continued to supply their customers with the Chicopee box. Selling price, construction of the box, and business exertions seem not to have influenced a single customer or dealer. Complainant therefore lost sales to the full extent of the demand supplied by defendants with the infringing box. There is no evidence to justify a conclusion that defendants would have supplied any portion of this demand with any box other than the patented box but for the infringement. It does not appear that they were acquainted with any other knock-down box, with perhaps one exception, the production of which was stopped by an injunction. Defendants' box department was a mere incident to their general business, receiving practically no attention other than to bill orders which came naturally and without effort. Irrespective of these considerations, the complainant had salesmen traveling throughout the territory in which defendants made their principal sales, canvassed the trade generally, and was ready to supply the entire demand. From these facts I deem it a safe and prudent conclusion that complainant and its predecessors would have supplied the demand filled by the infringing box but for the infringement. The damage inflicted is the loss of profit upon an equal amount of sales."

He further found a number of infringing boxes sold by the defendants, and the amount paid for them, and that the profits derived from the manufacture and sale of the patented box during a portion of the time of the infringement was 31 per cent., and that the selling price of the two boxes was alike, and that the proved loss to the complainant was $382.90,—31 per cent. of $1,235.19, the amount paid for boxes during the time when the profit was ascertained. The profit upon the patented boxes made before that time was not satisfactorily proved.

The defendants say that "manufacturer's profit" ought to have been deducted from this profit, and, if deducted, the net result would have been $2\frac{1}{2}$ per cent. of $1,235.19. This estimate is made as follows: The master found that the complainant's profit on the patented boxes was 31 per cent. The secretary of the plaintiff testified that his firm in 1890 made $28\frac{3}{4}$ per cent. on unpatented tubular boxes having closing ends. Subtracting this amount from the 31 per cent., the remaining $2\frac{1}{4}$ per cent. is said to be the entire profit when a reasonable manufacturer's profit has been deducted, if such profits were to be allowed. This estimate is based upon premises which prove nothing. When the complainant's damages are measured by the profits of the defendants, it is true that credits have been allowed to the latter "as a mere agency for producing the patented article, for a so-called 'manufacturer's profit.'" Warren v. Keep, 155 U. S. 265, 15 Sup. Ct. 83. This rule has generally been applied in cases where the patented invention is a distinct improvement, and a part only of the entire structure which was made and sold. Buerk v. Imhaeuser, 14 Blatchf. 19, Fed. Cas. No. 2,107. In a noted case, where the patent was for an entirely new product of a new process,

which was not separable into parts, and the infringing defendant made and sold the entire article, manufacturer's profits were not allowed, upon the ground that the entire profits, which were the difference between cost and yield, belonged to the owner of the patent. Rubber Co. v. Goodyear, 9 Wall. 788. In this case the complainant's damages are not measured by the profits of the defendants, but by its own losses. It is a case of the infringement of an entire article and of a new article of manufacture, the entire profits of which are attributable to the patented improvement. It was, when introduced into the market, a previously unknown article. The tubular boxes fastened together by mucilage and interlocking at the end, which were then in use, were an entirely different structure. The knock-down boxes shown in the patents of Buckingham and Caussemille were not in use. The Ritter device was a new kind of box for the purposes for which it was to be used. It is true that the principle of reduction of the profits of the defendant infringer by the deduction of manufacturer's profit when the patented improvement was a separable part of the entire structure has been thought applicable in two cases to a reduction of damages based upon loss of the complainant's profit, when the patented improvement was a distinct and separable part of the whole structure which the complainant made; as, for example, where the improvement was a small part of the structure of a watch. Buerk v. Imhaeuser, 14 Blatchf. 19, Fed. Cas. No. 2,107; Robertson v. Blake, 94 U. S. 728. The facts of this case have no resemblance to those of the cases just cited. There is no apparent reason why the loss which was suffered by the deliberate act of the defendants, which deprived the complainant of trade in the special articles of manufacture, every expense of its business going on as before to its full extent, should not be the actual profit which it would have made upon the sale of a number of boxes which it was prevented from selling.

The portion of the decree which doubled the damages is the final subject of alleged error. The master found that the defendants were deliberate infringers. They bought a part of their boxes from the Dayton Company under a guaranty against loss by reason of any claimed infringement. They were perfectly indifferent to the claimed rights of any one else, and purchased infringing goods from the Dayton Company on March 26, 1892, a month after the issuance of a preliminary injunction against them, and nearly 1½ months after the date of Judge Lacombe's opinion. While the master cautiously does not find a removal of their books and papers to evade the accounting, it appears that they did not exert themselves to produce them. They were passive instruments in the hands of the real defendant, and permitted all the difficulties which the master has detailed to be interposed. The doubling of the small amount of damages which the master was able to find was a proper exercise of power of the circuit court.

The decree of the circuit court is affirmed, without interest, and with costs of this court.