SPERRY PRODUCTS, INC., et al.,
Plaintiffs,

v.

ALUMINUM COMPANY OF AMERICA
and Electrocircuits, Inc., Defendants.

Civ. A. No. 31352.

United States District Court
N. D. Ohio E. D.

Jan. 6, 1959.

Charles B. Gordon, Ely, Pearne & Gordon, Cleveland, Ohio, R. Morton Adams, J. Philip Anderegg, Pennie, Edmonds, Morton, Barrows & Taylor, New York City, for plaintiffs.

Carlton Hill, Hill, Sherman, Meroni, Gross & Simpson, Chicago, Ill., William L. Hanaway, Breed, Abbott & Morgan, New York City, Thomas J. Doran, Hyde, Meyer, Baldwin & Doran, Cleveland, Ohio, for defendants.

McNAMEE, District Judge.

This is an action for infringement of four patents of plaintiff, Floyd A. Firestone, Nos. 2,280,226, 2,398,701, 2,467,301 and 2,592,134, which will be referred to sometimes hereinafter as Nos. 1, 2, 3 and 4. All of the patents relate to flaw detection apparatus and the use thereof. The Claims of the patents which it is alleged were infringed are Patent No. 1, Claims 2, 3, 4, 10 and 11; Patent No. 2, Claims 7, 16, 19, 20, 25, 26, 29 and 32; Patent No. 3, Claims 1, 2 and 3; Patent No. 4, Claim 2.

### The Parties

The plaintiffs are: Floyd A. Firestone, inventor of all four patents in suit and the owner of the legal title to Patent No. 1; Sperry Products, Inc., a New York corporation, the exclusive licensee under Patents 1 and 2, and the owner of Patents 3 and 4; United Aircraft Corporation, a Delaware corporation, the owner of Patent No. 2, and present here as an involuntary party plaintiff.

The defendants are: The Aluminum Company of America (hereinafter called Alcoa), a Pennsylvania corporation, with a place of business at Cleveland, Ohio, where it has used the accused apparatus known as an Immerscope; and Electrocircuits, Inc., maker and supplier to Alcoa of such apparatus. Electrocircuits is a California corporation, having no place

904

of business in the jurisdiction of this Court but became a party by the voluntary filing of an Answer and Counterclaim.

## The Pleadings

The Complaint alleges infringement of the Claims enumerated above. The Answer denies infringement and alleges invalidity of the patents on several grounds, including alleged misrepresentations to the Patent Office, lack of invention, anticipation by prior patents and publications, ambiguity, failure to fully disclose invention and misuse of the patents. A counterclaim filed by Electrocircuits for treble damages alleges that damages were sustained by that defendant as a result of the violation by plaintiffs of the antitrust laws. The affirmative defenses alleged in the Answer and the alleged violation of the antitrust laws set forth in the Counterclaim of Electrocircuits are denied by plaintiffs. Thus, the principal issues are: Invalidity, infringement, alleged misuse of the patents and alleged violation of the antitrust laws.

## Preliminary Statement

The devices described by the patents in suit which are sold under the trade name "Reflectoscope" are instruments that use the pulse echo ultrasonic method in the detection of flaws in metal parts. By this method ultrasonic sound waves having a higher frequency than that audible to the human ear and capable of penetrating solid, liquid or gaseous material are propagated into a metal part. The waves travel through the part at a known speed of propagation characteristic of the material of the part under inspection. When the waves reach the opposite end of the part or when they encounter discontinuities or flaws therein their echos are reflected back to the face of the part. The reflections from flaws nearest the entering end of the part arrive at that point before the reflections from discontinuities farther away and sooner than the reflections from the opposite end of the part. As these various reflections reach the entering end of the part they are amplified and by means of

a sweeping motion of a beam of cathode rays they are registered on a cathode ray oscilloscope in a manner that permits the determination of the time of travel of the waves and the location of flaws in the part. In order to measure accurately the time of travel of the waves to and from the reflecting surfaces, it is necessary to propagate them in short bursts or pulses to permit the reception of the reflected echo prior to the propagation of a subsequent pulse, hence the term "pulse echo."

In the early 1950's Donald Erdman, a former president and founder of Electrocircuits, developed a so-called Wide Band Converter. This device had the circuitry necessary to produce ultrasonic vibrations as high as 25 megacycle frequency and the apparatus to amplify and receive the electrical impulses generated by the returning echoes. The wide band converter was used primarily for detecting flaws in parts by placing the part to be inspected under water. In 1952, when Electrocircuits was ready to place its device on the market, Richards, then president of Electrocircuits, conferred with Farwell, president of Sperry, with the view of effecting an arrangement that would enable Electrocircuits to sell its apparatus without being sued for infringement by Sperry. Richards proposed that Sperry license the Firestone patents to Electrocircuits or, in the alternative, that Electrocircuits sell its apparatus to Sperry for resale by the latter. Both proposals were rejected by Sperry. Later an agreement was reached by the terms of which Sperry agreed to permit Electrocircuits to sell its device but only upon condition that each wide band converter would be used in conjunction with a Sperry Reflectoscope. Under this arrangement the only part of the Reflectoscope that was used was the cathode ray oscilloscope. All other functions of the dual apparatus were performed by the wide band converter, the Reflectoscope being 80% useless. This arrangement was effective for but a substantially short time, after which Electrocircuits placed the accused Immerscope on the market.

Some of the accused devices were sold to the defendant Alcoa and used by it in its plant in Cleveland, Ohio. This suit followed. Electrocircuits was unable financially to defend this action and entered into a contract with Curtiss-Wright Aircraft Corporation, by the terms of which Curtiss-Wright agreed to finance the defense of the litigation. As a part of this agreement Curtiss-Wright was granted the right to manufacture and sell Immerscopes upon the payment of royalties to Electrocircuits. The Immerscope is a device used primarily in underwater inspection of metal parts but it is used also for flaw detection where the part to be inspected is not submerged. It is plaintiff's claim that the Immerscope is in all respects the equivalent of the device described in the claims of the Firestone patents in suit.

Defendants direct their heaviest fire against the validity of the patents, about 80% of their voluminous brief being devoted to a discussion of that issue. Their defense against the charge of infringement is generally that the Immerscope follows the prior art rather than the teachings of the Firestone patents. Additionally they rely upon a number of separately stated grounds to avoid infringement of some of the many claims in suit.

The issues raised by the defense of misuse of the patent and Electrocircuits' counterclaim based upon an alleged violation of the antitrust laws have been dealt with in separate briefs. Accordingly, in this opinion the issues of validity and infringement will be discussed in that order and will be followed by an inquiry into the merits of the allegations of misuse of the patents and those relating to the alleged violation of the antitrust laws.

## Is Patent No. 1 Valid?
### Alleged Misrepresentations to the Patent Office

Defendants' first ground of attack on the validity of Patent No. 1 is based upon the claim that Dr. Firestone made misrepresentations to the Patent Office in relation to submarine sounding devices, particularly that of Langevin, et al., Patent No. 1858931, issued May 12, 1932, that induced the Examiner to approve the issuance of the patent applied for by Firestone. The application was filed May 27, 1940. By Patent Office action of August 6, 1940 several of the claims were rejected on prior art, including Langevin. On January 18, 1941 Dr. Firestone requested reconsideration of the rejected claims, and in support thereof submitted an extensive argument in which, among other things, he delineated the critical differences between Langevin and the invention described in Firestone's application. The Langevin invention is an apparatus for depth sounding and the location of submarine obstacles by means of ultra audible waves. It is intended for use in the ocean and other navigable waters to insure greater safety in navigation but was not designed to function as an instrument for the detection of flaws in metal parts. In his argument to the Examiner Dr. Firestone said, inter alia:

"* * * Langevin teaches how to determine distances of several fathoms in water where the reflected wave train will be received after 10,000 microseconds or more; I teach how to determine the thickness of a piece of steel when it is even as thin as $\frac{1}{16}$ inch and when the reflected wave train arrives 0.2 microseconds after the initial pulse. (I have actually done this.) The apparatus described by Langevin could not possibly accomplish such a result, no matter how much its refinement along the lines described; the errors in the mechanically operated switch, the inertia of the mechanical oscillograph, and the fact that the wave trains last as long as 'less than $\frac{1}{1000}$ second' would make the least distance which could be detected, of the order of 10 feet or more, and even then there would be a large error in the determination."

"* * * After study of Langevin's disclosure, I have placed this

limit at 10 feet in length his equipment would not function on pieces less than 10 feet long (if indeed it would even be satisfactory at 50 feet) and I claim as my invention the application of the reflection principle to all pieces smaller in length than 10 feet."

By action taken on February 15, 1941, the claims were again rejected on the prior art. On August 14, 1941 Dr. Firestone submitted a lengthy response to this second rejection, in which he outlined precisely and in great detail the many factors which, in his opinion, operated to render the references cited by the Patent Office inapposite. Among other things, he said:

"In my last reply I tried to distinguish my invention from the submarine sounding devices, the general distinction being that, since the linear dimensions of a metal part to be inspected may be $\frac{1}{1000}$ as great as even the shallower depths of ocean to be measured, the wave train in my metal part must be $\frac{1}{1000}$ as long, my indicating device must be 1,000 times as fast, and the synchronization of the wave emitting device and the time scale in the indicating device must be 1,000 times as accurate. The refinement of the ocean sounding device by a factor of 1000 is no mere matter of mechanical skill but requires profound novelty. Since longitudinal waves travel through about $\frac{1}{4}$ inch of steel in one millionth of a second, the parts of my device must function with a consistent accuracy of a fraction of one millionth of a second."

In this second argument Dr. Firestone referred to the measurement by his apparatus of a piece of steel $\frac{1}{16}$th inch as follows:

"Since I have seen successive reflections in a steel plate $\frac{1}{16}$th in. thick I know that my synchronization is good to $\frac{1}{2}$ microsecond."

On October 4, 1941 the claims were again rejected by the Patent Office. On October 10 and 11, 1941 Dr. Firestone had interviews with the Examiner, and on October 23, 1941 he filed amended claims and, as indicated above, Patent No. 1 issued on April 21, 1942. It is contended by defendants that in the portions of Dr. Firestone's arguments quoted above the following misrepresentations were made:

1. That by the use of his apparatus Firestone measured a metal part as thin as $\frac{1}{16}$th of an inch.

2. That the submarine sounding devices disclosed by the prior art, and particularly that described by Langevin, could not measure distances of 10 feet or less.

3. That Firestone's apparatus constituted a refinement of the depth sounding devices by a factor of 1,000.

Defendants assert that these alleged misrepresentations, particularly the representation as to a refinement by a factor of 1,000, persuaded the Patent Office to issue Patent No. 1.

In support of their contention that Dr. Firestone did not measure a piece of steel $\frac{1}{16}$ inch thick with his invention, defendants in their original brief relied upon a photograph of a test made by Dr. Firestone on March 1, 1940 on a Hamilton propeller blade which indicated difficulty in measuring a distance of 10 inches. They also relied upon an excerpt from a statement of Dr. Firestone's attorney to the Patent Office in connection with the application for Patent No. 2 which reads:

"Hence with the apparatus of applicant's prior patent inspection or testing over small distances or for small parts could not satisfactorily be made."

However, as hereinafter shown, a test made on November 2, 1940 shows clearly that the evidentiary facts upon which defendants rely afford no support for their contention. In their original brief defendants raised the question that Dr. Firestone may have made the $\frac{1}{16}$th inch measurement by using improvements not disclosed in Patent No. 1. The Court's

examination of the voluminous record disclosed evidence not discussed or referred to by counsel in their briefs which seemed clearly relevant to the question whether Dr. Firestone measured ⅟₁₆th inch of steel by using improvements not disclosed in his application. Such evidence, considered with the evidence referred to by the parties, seemed fairly susceptible of the inference that the ⅟₁₆th inch measurement could not have been made otherwise than by using improvements not disclosed in Patent No. 1. In the interest of affording both sides an opportunity to comment thereon, the Court wrote identical letters to counsel outlining the evidence apparently overlooked by them. It will be sufficient for the purposes of this discussion to indicate in the following paragraph the more significant aspects of the evidence referred to in the letters to counsel.

Dr. Firestone's first reference to the ⅟₁₆th inch measurement appeared in his argument to the Examiner dated January 8, 1941 and received by the Patent Office on January 16, 1941. In a letter dated January 15, 1941 Dr. Firestone informed Edward Eaton of the Hamilton Propeller Division of United Aircraft that a measurement of a parallel plate ⅟₁₆th inch thick had been made. In this same letter Dr. Firestone stated:

"This improved operation and high speed has been made possible by two improvements; first, the damping of the quartz crystal by the addition of a heavy layer of wax to its back side, and, second, the construction of a new amplifier having very short time constants in all parts of its circuit."

In Patent No. 2, which was applied for after Patent No. 1 issued, there appeared certain statements which seemed to indicate that the measuring capability of the improved apparatus of the later patent was limited to ⅟₁₆th inch. Testifying as a witness at the trial, Dr. Firestone stated, in effect, that shorter distances could be measured with the apparatus of Patent No. 2 than with the apparatus disclosed in the Number 1 patent. He further testified that ⅟₁₆th inch could be measured with Patent No. 1 by the application of the successive reflection technique disclosed in that patent. In its letter the Court noted the difficulty of reconciling Dr. Firestone's testimony with the statements made in his letter to Eaton and the statements appearing in Patent No. 2, and suggested that counsel express their views on the relevancy and legal effect of the evidence referred to in the letter.

In response the Court received two additional memoranda from counsel on each side and a memorandum from Dr. Firestone who, although a party to the action, was not represented by counsel. It would serve no useful purpose to review in detail the arguments advanced in the supplemental memoranda. Although the Court had expressed no opinion on the merits of the controversy, defendants characterized the observations of the Court as being "eminently correct" and, for the first time, the defendants contended that Firestone's representations to the Patent Office in respect of the ⅟₁₆th inch measurement were false and fraudulent. In their supplemental memoranda counsel for Sperry point out that the amplifier referred to in the letter to Eaton was an improvement within the skill of the art as taught in Patent No. 1 and that the damping of the crystal was the only improvement used in the ⅟₁₆th inch measurement that was not within the disclosures of that patent. Sperry also argued persuasively that although Patent No. 2 makes specific reference to a measurement of ⅟₁₆th inch it is nevertheless possible to measure shorter distances with the apparatus of that patent. In addition Sperry directed attention to plaintiff's Exhibit 54 hitherto overlooked by counsel and the Court which shows that two months before his first representation to the Examiner Firestone had actually measured a parallel plate of aluminum ¼ inch thick with the apparatus of Patent No. 1. Exhibit 54 is a written entry dated November 2, 1940 appearing on page 46 of Dr. Firestone's notebook. It records the reflections in parallel plates of aluminum ¼

inch to 1 inch thick by using a crystal of 4 megacycle frequency. Defendants do not deny that Exhibit 54 reflects the measurement of ¼ inch of aluminum by the apparatus of Patent No. 1 unaided by any improvement. They assert merely that the recording of such test indicates that its results were unobvious and unexpected. However, the importance of Exhibit 54 cannot be minimized. The fact that the apparatus of Patent No. 1 unaided by improvements was capable of measuring ¼ inch of metal is of the utmost significance in relation to the representation of Firestone to the Examiner. Sound waves travel through aluminum at about the same rate of speed as through steel. With Exhibit 54 available as evidence of the capability of Patent No. 1, it was wholly unnecessary for Firestone to represent that he had measured ⅟₁₆th inch of steel with the apparatus of that patent unless he had actually done so. The ¼ inch measurement was alone sufficient to demonstrate the infinitely greater speed of operation of the device of Patent No. 1, vis-a-vis, the depth sounding devices cited by the Patent Office. It is unreasonable to suppose that Firestone would have deliberately cheated on a matter of fractions of an inch where there was no need or motive for doing so. Furthermore, in the light of the results obtained by using a crystal of 4 megacycle frequency as shown by Exhibit 54, it seems probable that by the use of crystals of higher frequency as taught by Patent No. 1 and by following the teachings of that patent in all other respects, the apparatus of the patent could measure distances shorter than ¼ of an inch. In its supplemental memorandum Sperry demonstrates convincingly that the measurement of ⅟₁₆th inch is within the capability of Patent No. 1. The defendants have made no effective answer to the arguments advanced by Sperry in this regard. I am satisfied therefore that the test of November 2, 1940 does not represent the full measuring capability of Patent No. 1.

The comparisons made by Firestone in his representations to the Examiner were of measurements of the order of 10 feet or more in water with measurements of the order of fractions of an inch in solids. In view of this, the slight difference between ¼ inch and ⅟₁₆ inch cannot be considered as a material variance sufficient to have warranted the rejection of Firestone's application. As will be shown, the measurement of ¼ inch was sufficient to demonstrate the wide disparity in the respective speeds of operation of the patented device and the depth sounding devices cited by the Patent Office. It may well be that the ⅟₁₆th inch measurement referred to by Firestone in his representation to the Examiner was made with the improvements referred to in the letter to Eaton. But this does not alter the fact that the demonstrated capability of Patent No. 1 to measure ¼ of an inch as well as its potential capability to measure shorter distances was sufficient to overcome the presumed anticipatory effect of the prior art cited by the Patent Office. I hold, therefore, that the representation of Dr. Firestone as to the ⅟₁₆th inch measurement was not fraudulently made and that under the circumstances such representation was not a material departure from the true measuring capability of Patent No. 1. Sperry has requested permission to demonstrate to the Court that the apparatus of Patent No. 1 is capable of measuring ⅟₁₆th inch of steel and proposes to make such demonstration by using only such components of the device as were available at the time the application for that patent was pending. However, for the reasons stated above, I deem such a demonstration unnecessary. The request is therefore denied.

In support of their contention that the representation that Langevin's apparatus could not measure a part of the order of 10 feet or less, defendants rely upon prior art not cited by the Patent Office, consisting of three issues of the International Hydrographic Review published, respectively, in November 1924, July 1926 and November 1938. In the first of these publications, which discussed the apparatus constructed by Langevin, it is as-

serted: "The return of an echo has been received distinctly from 1 meter only." The second publication describes an echo sounder with which "soundings may be obtained in 2 feet of water or even less." And the 1938 Review refers to measurements of a depth of 1'3" in the Thames River and a measurement of a depth of 6 inches in a test tank. Defendants do not claim that Dr. Firestone had knowledge of these tests at the time he made his representations to the Patent Office and they disclaim any purpose to impute to him a fraudulent intention in stating that Langevin's apparatus was incapable of measurements of the order of 10 feet or less. However, they do claim that the prior art cited by them demonstrates that Dr. Firestone's statements were erroneous.

Necessarily the statements of Firestone relative to the capability of the depth sounding devices cited by the Patent Office were estimates rather than representations of facts. However, they were conservative estimates. It has not been shown that any of the depth sounding devices cited by the Patent Office could measure 10 feet or less in solid parts. All that has been shown is that on the basis of Langevin's apparent capability to measure one meter (39.37 inches) in water Firestone overestimated the degree of refinement of his invention over Langevin, which was the best of the file wrapper references. However, if the statement in the 1924 publication that Langevin measured a depth of one meter be accepted as correct, it would nevertheless be true that Firestone achieved a degree of refinement over that reference by a factor of substantial magnitude. Sound waves travel through steel more than four times as fast as through water. The round trip travel time of such waves through 39.37 inches of water is approximately 1,400 microseconds whereas the round trip travel time of such waves through 1/4 inch of steel is 2 microseconds. Thus, on the basis of the demonstrated capability of apparatus No. 1, Firestone achieved a degree of refinement over Langevin by a factor of approxi-

mately 700. This is less than Firestone's estimate of the factor of 1,000, but the fact that the apparatus of Patent No. 1 operates at a rate of speed approximately 700 times greater than the speed of the best of the devices cited by the Patent Office is more than sufficient to sustain the burden of Firestone's argument to the Examiner that such depth sounding devices could not operate fast enough to be used for the detection of flaws in solid parts. Computed on the assumption that the apparatus of Patent No. 1 is capable of measuring 1/16th inch of steel the factor of refinement would be substantially more than 2,000. The best of the depth sounding devices now cited by defendants is the Marconi echo meter, which apparently measured a depth of 6 inches in water. The round trip travel time of sound waves in 6 inches of water is 212 microseconds, or more than 100 times as slow as the round trip travel time through 1/4 inch of steel. If the Patent Office had cited the best performance of the Marconi echo device and Firestone represented that Patent No. 1 was capable of measuring 1/4 inch of steel, he nevertheless would have been able to show a refinement of his device over the best of the references now cited by defendants by a factor of 100. Otherwise stated, it appears beyond question that Firestone had actually measured a time interval over one hundred times shorter than any time interval measured by any depth sounding device discovered in the prior art. Therefore, on the basis of the strictest test that can be applied fairly, the apparatus of Patent No. 1 is more than one hundred times better in its capability to measure short time intervals than the best of the references cited by defendants. If it be assumed that the device of Patent No. 1 could measure 1/16th inch of steel, the refinement of Firestone's invention over the best of the prior art would be represented by a factor of more than four hundred.

There are yet other factors to be considered in determining the issue of misrepresentation. The increased speed and accuracy of the patented device was di-

rected to the accomplishment of a wholly different object than that of the depth sounding devices. Patent No. 1 represents no mere improvement of prior inventions. It is the first and basic patent in the field of ultrasonic pulse echo flaw detection. In reliance upon its validity several additional patents covering improvements on the basic invention have been granted. Its validity has not heretofore been challenged. A substantial industry has been based upon the patent. In these circumstances it would be grossly unjust and unfair to overthrow the statutory presumption of validity solely because of the immaterial differences in the estimates and representations of Dr. Firestone.

A fair analysis of the record leads to the conclusion that defendants have failed to sustain their claims of misrepresentation by that degree of clear and satisfactory proof required by law. I find that the presumption of the validity of Patent No. 2280226 has not been impaired by misrepresentations to the Patent Office.

### Are the Claims of Patent No. 1 Invalid because of Insufficient Disclosure?

■■ Defendants allege that the disclosures of the patent are "very meager." They complain that the amplifier, rectifier, linear sweep and oscilloscope are shown in Fig. 1, by rectangles or a circle, and, although conceding that the circuit diagrams for the high frequency oscillator, modulator and pulse oscillator are shown on Fig. 2, they assert that no values are given. It may well be that the disclosures would be insufficient to enable a layman to understand the principle of the patent or apply the means therein described but the detailed description of the invention is clear, exact and sufficiently precise to enable one skilled in the art to make and use the invention. The statute requires no more. The correctness of the statement in the patent that the circuits as shown in Fig. 2 "will be understood by any one skilled in the art" is not questioned. The claim that no values are given is fully answer-

ed by the statement of the Court in Hazeltine Research v. Avco Mfg. Co., D. C., 126 F.Supp. 595, 599, affirmed 7 Cir., 227 F.2d 137, certiorari denied 350 U.S. 987, 76 S.Ct. 474, 100 L.Ed. 854 that:

"The original Toulon Patent 2,-227,815 and the patent in suit, Re. 22,055, are not indefinite or incomplete because of the fact that they do not specify the values of various circuit elements, since such values, per se, were not a part of the invention; they were not critical; they were well within the skill of competent radio engineers at the time the Toulon invention was made; and since it is not customary to specify values of circuit elements in the specifications of patents dealing with inventions of a system character, as contrasted to those dealing with particular elements or components of a system."

Defendants also claim that the subject matter of the claims adds nothing to the prior art. Their principal reliance in support of this contention is the 1935 Russian publication of Sokolov which they assert fully taught the echo principle of testing small parts. This contention is disputed vigorously by plaintiffs. The issue thus raised will be dealt with hereinafter in discussing the pertinency of prior art cited by defendants. Sokolov refers to a high damping decrement as being a desirable physical property of the quartz plates but does not teach how such a property is to be imparted thereto. Nor does he teach damping by employing an energy absorbing member attached to the plates. The Williams patent for depth sounding refers only to damping of electric oscillations and shows no means for accomplishing this result. Firestone teaches the means to produce voltage trains containing either a plurality of oscillations or as little as one-half a single oscillation. This provides a most effective means of damping. Defendants' contention that Verman, et al. publication of 1934 discloses the electronic system used by Firestone, ignores the fact that the application of Firestone's system is to

the measurement and inspection of metal parts while Verman deals with a system designed for "Recording the Retardation and intensities of echoes from the Ionosphere." The device described in Verman does not differ significantly from the file wrapper reference of the Hart patent 1979225. Defendants also contend that Firestone does not teach the desirability of a short time constant but his disclosure that the amplifier should have a uniform response from 1,000 to 10,000,000 cycles per second is the equivalent of such teaching.

█ The disclosure of a patent is presumed to be sufficient from the allowance and issuance of the patent. Holstensson v. Webcor, Inc., D.C., 150 F.Supp. 441. I find no inadequacy of disclosure sufficient to overcome that presumption.

Alleged Anticipation of Claims 2, 3, 10 and 11 by (a) Publication of Verman et al; (b) Stocks and Rust Publication; and (c) Sokolov Publication

(a) As indicated above, the Verman publication relates to the location of ionized layers in the upper atmosphere by the application of the pulse echo method to pulses of electro-magnetic waves. The field of research in which the instrument discussed in Verman is employed is alone sufficient to distinguish that reference from the Firestone invention. This distinction is further illustrated by the substitution in Firestone's invention of an electro-mechanical transducer for the antenna of Verman and the propagation of much shorter train waves. The contention of the defendants that Verman is distinguishable from the file wrapper reference of Hart because the latter shows a circular or rotating sweep is not well founded. Hart has a linear sweep. The Verman publication deals with the non-analogous art of radio and radar and it is clear that the above claims of Patent No. 1 are not anticipated by that reference.

(b) The Stocks and Rust publication is a translation of an article in the German language which was published in 1935. That publication reports the results of echo soundings taken in the ocean and in the Harbor of Kiel where in some regions multiple echoes were observed, and the author suggests that these multiple echoes represent successive reflections from the bottom of the bay and from successive layers of ooze and mud. Defendants contend that ooze, mud and clay are solids but manifestly they are not the equivalents of the bounded parts referred to in the Firestone patent. Although counsel for defendants assert that the reference shows the penetration of rock at the bottom of the ocean, defendants' expert witness, Fishleigh, stated: "I don't find any indication of going into the rock." While defendants place considerable emphasis on this translation as an anticipation of Patent No. 1, it seems clearly to be outside the scope of the prior art. It contains no teaching of the measurement, exploration or inspection of solid parts. The results of the tests described therein lead to few, if any, definitive findings. The authors refer to their surmises, assumptions and hopes and the need for further investigation to determine the speed of sound in mud. Expressions dealing with surmises and hopes appear on pages 3, 7 and 9 of the publication. This publication cannot be regarded as anticipating Firestone Patent No. 2280226.

(c) The Sokolov reference is a translation of a Russian article published in 1935 on the subject "Ultrasonic method of determining internal flaws in metal parts." The author is S. Y. Sokolov to whom Russian Patent No. 48894 was issued about 1936. On June 27, 1939 U.S. Patent No. 2164125, covering "Means for indicating flaws in materials," was issued to S. Sokoloff on an application filed August 21, 1937. The U. S. Patent was a file wrapper reference against Firestone's application for his No. 1 patent. The Russian patent is cited by defendants but it is not contended seriously that such reference constitutes an anticipation. The defendants, however, rely heavily upon the Russian publication of 1935. It is fair to say that of the hundreds of exhibits in the record, this reference has

received the most elaborate treatment in the evidence and in the briefs of counsel. After a careful study of the evidence and arguments of counsel, I am of the opinion that Sokolov's teaching differs from that of Firestone Patent No. 1 in many respects, including the following:

1. Firestone teaches that the trains of waves propagated into a work piece must be of shorter duration than the time intervals separating them in order that the reflected echoes may be received prior to the propagation of a subsequent train of waves. Sokolov teaches the propagation of successive groups of waves spaced by intervals of time equal to their own length. When the Sokolov transmitter is operating, the receiver is turned off and, conversely, when the receiver operates, the transmitter does not function. Thus, in Sokolov, energy is fed into the work piece half the time and this results in the delayed arrival of reflections at the receiver when it is turned off and produces the unfavorable effect of multiple reverberations. Defendants contend that plaintiffs do no more than merely emphasize this undesirable feature of the Sokolov device. However, Sokolov himself takes a more serious view of the matter, saying:

"However, although the above methods permit the detection of heterogeneities in metals by the observation of maximal or minimal signals of the receiver, it is manifest that the unfavorable effect of multiple reflections of ultrasonic vibrations from the faces of the tested piece is not eliminated in the described methods. We need a somewhat different arrangement."

Sokolov, however, makes no provision for the observation of such "maximal or minimal signals" except by noting their different degrees of intensity.

2. The alternate method of flaw detection suggested by Sokolov depends upon the observation of the increase in the path followed by sound waves in passing around a flaw, when a flaw is present as compared to the length of the path of sound waves between the points of transmission and reception when no flaw is present. In marked contrast, Firestone teaches the measurement of the time required for sound waves to reach a flaw and be reflected directly therefrom to the receiver. The apparatus discussed by Sokolov is for flaw detection by the accoustical shadow method, which is similar to the method described in the file wrapper reference of the Sokoloff United States patent, which does not provide for the measurement of time required for sound waves to reach a flaw and be reflected back.

3. The Sokolov publication provides no instrumentation for the presentation of signals from which accurate findings can be made in respect of the round trip travel time of sound waves through a work piece and their return to the receiver and the time of travel to a flaw and back again. Firestone, however, teaches the use of a cathode ray oscilloscope on which such a presentation is made. In an effort to supply the deficiency in Sokolov, the defendants' expert, Fishleigh, produced a chart showing the system discussed by Sokolov with the addition of a cathode ray oscilloscope which he testified was an obvious improvement suggested by the reference. The testimony of Fishleigh in relation to the chart was given by him in surrebuttal. Earlier in the trial, Fishleigh admitted there was no suggestion in Sokolov that the signal output of the receiver be applied to an oscilloscope. In the Sokolov publication the author made reference to a cathode "oscillograph" in connection with his discussion of the phase difference between the generator and the receiver, stating that "a cathode oscillograph will be used for a convenient adjustment of the required phase." Thus it appears that Sokolov intended to use an oscilloscope for a purpose other than that suggested by Fishleigh. The effect of Fishleigh's testimony, however, is to demonstrate the need of an addition of an oscilloscope and a linear sweep to the Sokolov device. Such a necessary modification of Sokolov disqualifies it as an anticipation. In Topliff v. Topliff, 145

U.S. 156, 12 S.Ct. 825, 828, 36 L.Ed. 658, the Supreme Court laid down the rule that:

"It is not sufficient, in order to constitute an anticipation of a patented invention, that the device relied upon might, by modification, be made to accomplish the function performed by that invention, if it were not designed by its maker, nor adapted, nor actually used for the performance of such function."

Moreover, it appears that other and substantial modifications of Sokolov not suggested in Fishleigh would be necessary to make that reference conform in structure, purpose and function with the teachings of Firestone. In Cold Metal Process Co. v. Carnegie-Illinois Steel Corp., 3 Cir., 108 F.2d 322, 336, it was held:

"A prior device, in order to anticipate, * * * 'must have been complete, and capable of producing the result sought to be accomplished; and this must be shown by the defendant.'"

Furthermore, Sokolov, like Stocks and Rust, is a foreign reference and is effective only for what it clearly teaches and not for what may be made out of it. The Borg-Warner Corp. v. Mall Tool Co., 7 Cir., 220 F.2d 803.

In Baldwin-Southwark Corp. v. Coe, 76 U.S.App.D.C. 412, 133 F.2d 359, it was held that, where a foreign publication is used as a reference one may not read into it any information which it does not afford on its face.

Firestone's Patent No. 1 is not anticipated by Sokolov.

### Alleged Anticipation of Claim No. 4, Patent No. 1

Claim No. 4 is more detailed than the other claims of Patent No. 1, and includes inter alia "an oscilloscope whose spot is deflected in one direction by said sweep circuit and is deflected in a different direction by the voltage output from said receiving transducer." In support of their contention that Claim No. 4 is anticipated, defendants again refer to Sokolov, Verman and Stocks and Rust which are readily distinguishable but their principal reliance is upon Smith Patent No. 2143035. The Smith patent corresponds in significant respects to the file wrapper references of Hart and Langevin in effecting the synchronization of the operation of the transducer and the sweep of a cathode ray tube by means of *mechanically* operated switches. Such a method of synchronization is incapable of measuring accurately the short time intervals required by the operation of the flaw detecting apparatus invented by Firestone. The British patents cited by defendants are not materially different from the file wrapper references of Hart and McSpadden. The Smith patent relates only to a "cathode ray oscilloscope" and does not disclose the medium in which the distance measurements are to be made. Smith shows no electronic means for synchronizing the sweep and transmission of the wave trains, and, like other prior art cited by defendants, Smith does not disclose the purpose, means and mechanism for accomplishing the end of the patent in suit and it is restricted to the accomplishment of a substantially limited and different purpose and cannot be regarded as an anticipation. Gordon Form Lathe Co. v. Walcott Machine Co., 6 Cir., 1929, 32 F.2d 55.

Before closing the discussion of the validity of Patent No. 1, brief reference ought to be made to the numerous evidentiary facts that strengthen the statutory presumption of validity. That Firestone was the first to invent an apparatus capable of inspecting solid parts for flaws by the timing of echoes therefrom and measuring such parts by the timing of echoes from the opposite side of a part is beyond question. Witness after witness for the defendants attested to the priority and highly meritorious performance of the devices manufactured under the Firestone patents. The Firestone invention was described in most laudatory terms in respected scientific publications and unquestionably it filled a long

914

felt need. Dr. Firestone's achievement may be viewed in its true light by comparing it with the unsuccessful efforts of others, notably the Research staff of The General Electric Company.

On February 10, 1943 W. D. Coolidge, Vice President and Director of Research of The General Electric Company, wrote a letter to Dr. Firestone in which he stated that he had just learned of Firestone's success in developing "a supersonic method for the detection of flaws." Coolidge also expressed a desire "to have one of our men visit you and learn about the potentialities of this method as well as the possibility of our acquiring such a piece of equipment."

A significant paragraph of the letter reads:

"Stimulated by a Russian publication in this field several years ago we had a try at this method but without getting results of practical value."

Whether the Russian publication referred to in the letter was the Sokolov publication of 1935 or one of his other articles which are exhibits in the record of this case is of relatively minor importance. The significant fact is that the highly skilled and superbly equipped staff of engineers and scientists in the Research Department of The General Electric Company, with knowledge of the prior art of a Russian publication, were unable to accomplish the results achieved by Firestone.

■ Defendants attack the validity of the patent on the ground that all of the elements of the patent are old. It has long been settled law that a combination of old elements achieving a new and useful result is a patentable invention. Walker on Patents, Deller Ed., Vol. 1, 1957 Supp., p. 215. Defendants also advance the argument that a mere change in the degree of accuracy of measurement is not invention particularly where all components contributing to such change are commercially available. In support of this claim defendants cite and rely upon Paramount Publix Corp. v. American

Tri-Ergon Corp., 294 U.S. 464, 55 S.Ct. 449, 79 L.Ed. 997; Altoona Publix Theatres, Inc. v. American Tri-Ergon Corp., 294 U.S. 477, 55 S.Ct. 455, 79 L. Ed. 1005; Suczek v. General Motors Corp., 6 Cir., 132 F.2d 371; Buffalo-Springfield Roller Co. v. Galion Iron Works, 6 Cir., 215 F.2d 686; Lempco Products, Inc. v. Simmons, 6 Cir., 140 F.2d 58. All of the cited cases are readily distinguishable on their facts. They enunciate no principle that requires a holding that a device for testing solid parts is unpatentable over depth sounding devices where, as here, the patented device operates by measurement of time intervals infinitely shorter than those measured by the depth sounding devices and where depth sounding devices were considered by the Patent Office in granting the patent.

### Validity of Claims 19 and 32 of Patent 2398701 (Patent No. 2)

Patent No. 2 relates to improvements of Patent No. 1 in the following respects:

1. Damping of the transducer.

2. The amplification of the voltage produced by the reflections by the use of a heterodyne amplifier, the intermediate frequency of which is higher than the frequency of the oscillations in the ultrasonic wave trains.

3. The use of improved means for the application of a train of voltage oscillations to the sending crystal.

In support of their contention that Claims 19 and 32, which relate to the damping feature of the patent, are invalid, defendants again rely on the Russian publication of Sokolov as an anticipation. While Sokolov refers to the need of a "damping decrement," he does not teach how the damping is to be accomplished and, as hereinbefore noted, a foreign reference is good only for what it clearly teaches. Borg-Warner Corp. v. Mall Tool Co., supra. Defendants also refer to the "inertia member" of the Hayes patent, No. 2424030. However, this is a tuning member and it has not been shown that it was also designed for

use as a means of damping. Defendants' chief reliance is upon the Bond-Mason patent, No. 2427348. That patent issued September 16, 1947 on an application filed August 19, 1941. The Firestone application for Patent No. 2 was filed June 29, 1942 and the patent awarded to Firestone April 16, 1946,—about a year and a half before the Bond and Mason patent issued. Dr. Firestone admitted that "Bond and Mason have indeed utilized the back side of a crystal plate for the application of a damping member." However, Dr. Firestone also testified that he completed his invention before the filing date of the Bond and Mason application, and supported such testimony by notebook entries of January 10, 1941 and February 4, 1941 and a letter to Edward Eaton dated January 15, 1941. These exhibits corroborate Dr. Firestone's testimony and are sufficient to antedate the reference. Armstrong v. De Forest Radio Tel. & Tel. Co., 2 Cir., 280 F. 584. However, defendants contend that Firestone's failure to apply for a patent until June 1942 shows that the tests of early 1941 were no more than abandoned experiments. In support of this contention defendants cite and rely upon Electro Metallurgical Co. v. Krupp Nirosta Co., D.C., 33 F.Supp. 324, 328, wherein it was held that the delay of the patentees in that case in filing their application "proves that an alleged earlier reduction to practice was * * * nothing more than an unsatisfactory or abandoned experiment." The cited case is not in point as shown by the following excerpts from page 328 of the opinion:

"There can not be a reduction to practice unless the inventor knows what he is doing. * * *

"If Becket and Franks are to prevail as prior inventors they must show, either that they had successfully reduced their invention to practice before the filing date of Schafmeister's German application, i. e., July 21, 1930, or that they had conceived the invention before that date, and thereafter coupled their conception to reduction to practice by diligent efforts. In fact, they did not know what they were doing."

The evidence demonstrates that in January and February of 1941 Dr. Firestone did know precisely what he was doing and that his tests were successful. In the tests of January-February 1941 wax was used as the damping means, whereas in the application for the patent the damping means were described as "consisting usually in cementing the back of the crystal to a block of Bakelite, lead or other material which absorbs high frequency waves instead of transmitting them." However, this is not a fatal variance. The statute requires that the inventor set forth the best method contemplated by him at the time of his application but this does not preclude him from showing an earlier completion of his invention by the use of another material performing the same function. The claims in question disclose a damping means which "absorb high frequency waves instead of transmitting them." Wax is such a material. The Bond and Mason patent came after Firestone and although his application was later than that of the cited reference, Firestone's reduction to practice was earlier. Claims 19 and 32 are not anticipated.

### Validity of Claims 16, 25, 29 of Patent No. 2398701 (Patent No. 2)

Claim 16, which is representative of the three claims mentioned above, reads:

"16. In a device for the inspection or measurement of a part by means of supersonic vibration waves having means for producing a supersonic voltage train and an electromechanical transducer actuated by said voltage train producing means and having its sensitive area in effective contact with said part so as to radiate vibration wave trains into said part and generate voltage trains in response to wave trains reflected within said part; a heterodyne amplifier actuated by said transducer and having an intermediate frequency higher than the frequency of the alternations produced

by said voltage train producing means and means actuated by said amplifier for indicating the time intervals between the voltage trains."

In support of their contention that the three claims in question are invalid, the defendants rely chiefly upon Harrison patent No. 2433361, issued December 30, 1947 on an application filed June 20, 1940, and Weisman Patent No. 2491540, issued December 20, 1949 on application filed December 31, 1940.

While there is a similarity in the apparatus of each of the references and that of Claims 16, 25 and 29, and each reference provides for a heterodyne amplifier whose intermediate frequency is higher than the signal frequency, both references disclose a device for use in the different art of depth sounding and neither reference discloses a device for the measurement of a part or for the detection of flaws in metal parts. Harrison shows a transmission that is discontinuous but his device also provides for wave signal impulses that vary continuously in frequency between the predetermined limits preferably in the supersonic range. The patent provides further:

"The fluctuation frequency, that is the number of times per second that a transmitted signal completes a cycle of frequency change between the said limits, is preferably of an audio frequency high enough to make possible a considerable number of complete frequency fluctuation cycles during the time length of the transmitted impulse."

The variation of frequency in the high audio range indicates that each outgoing pulse in Harrison is incomparably longer in time than the "extremely short time duration" taught by Firestone. The Harrison device is therefore not adaptable to the inspection of flaws located close to the surface of a metal part, as taught by Firestone. Harrison's device is an improvement on other similar devices patented by him and is designed inter alia to reduce the reverberations from noises, some of which are produced "by the motion of the ship through water, by the action of the ship's propeller or by sounds conducted to the water through the ship's skin." As stated in Patent No. 2, the purpose of a heterodyne amplifier whose intermediate frequency is greater than the signal frequency is to provide an amplifier that can recover its sensitivity within approximately a millionth of a second after the initial wave train is sent out.

Defendants contend that by his reference to the "blocking" of an amplifier Firestone merely describes in a new way the characteristics of a wide band pass or short time constants which increased the ability of the receiver to distinguish pulses separated by short intervals of time. This contention fails to recognize the true meaning of the term "blocking" and the object accomplished by the use in the Firestone patent of a heterodyne amplifier whose intermediate frequency is higher than the signal frequency. In an amplifier having a sufficiently wide band width pulses closely following each other will get through without overlapping. The "blocking" to which Firestone refers is the paralysis which overtakes an amplifier irrespective of its band width when the amplifier is overloaded by a signal of too high amplitude. The powerful thrust of the input signal of Firestone's device resulted in paraylsis or loss of sensitivity of the amplifier. Firestone was therefore confronted with the problem of providing an amplifier which would recover its sensitivity within approximately one millionth of a second so that it would be sensitive to the feeble train waves reflected back to the crystal from flaws distant only a fraction of an inch from the sending point. Firestone solved this problem by the use of the heterodyne amplifier whose intermediate frequency was greater than the signal frequency. The problem of "blocking" or receiver recovery did not arise in the operation of Harrison's depth sounding device with its long pulse substantially continuous wave system. Nor can it fairly be said on the authority of

General Electric Co. v. Jewel Incandescent Lamp Co., 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43, that Firestone's use of an old device of a heterodyne amplifier was not invention. Firestone did more than merely recognize a feature or advantage of a heterodyne amplifier as used in the depth sounding art. He used the heterodyne amplifier in the different art of non-destructive testing by the new technique of the ultrasonic pulse echo method to effect the novel and useful result of enabling the receiver speedily to recover its sensitivity and reflect the echoes from flaws close to the surface of the piece under inspection. Thus, by the use of imagination and inventive skill, Firestone adapted an old device to a new use in a different art and achieved an unobvious and useful result. The principle applicable here was well stated in Potts v. Creager, 155 U.S. 597, 607, 15 S.Ct. 194, 198, 39 L.Ed. 275, where it was said:

"Indeed, it often requires as an acute perception of the relation between cause and effect, and as much of the peculiar intuitive genius which is the characteristic of great inventors, to grasp the idea that a device used in one art may be made available in another, as would be necessary to create the device *de novo*."

The Weisman patent, like Harrison, discloses a depth sounding device and an echo ranging system but it discloses no means for keying the operation of the transmission to provide for the intermittent transmission of pulses. Apparently Weisman's transmitter operates continuously and in this respect differs from that of Firestone. No satisfactory showing has been made that Weisman's device is adaptable to the inspection of flaws close to the surface of a solid part or that Weisman was in any way concerned with the problems arising in connection with the use of a device to accomplish that purpose. There is nothing in the disclosures of the depth sounding devices of Harrison or Weisman that would teach a workman skilled in the art of non-destructive testing the solution of the problem solved by Firestone. Neither of the references cited by defendants anticipate the claims in question.

■ Defendants' argument that Claims 16, 25, 29 of Patent No. 2 were anticipated by Firestone's Patent No. 1 is not persuasive. Firestone was the inventor of Patent No. 1 and also invented meritorious improvements of his original device. In Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, at page 63, 43 S.Ct. 322, at page 328, 67 L.Ed. 523, the Supreme Court, speaking through Chief Justice Taft, held that a meritorious improvement was entitled to liberal treatment. While the "improver" in that case was not the inventor of the original machine, the following statement of the court is nevertheless pertinent here:

"Indeed, when one notes the crude working of machines of famous pioneer inventions and discoveries, and compares them with the modern machines and processes exemplifying the principle of the pioneer discovery, one hesitates in the division of credit between the original inventor and the improvers, and certainly finds no reason to withhold from the really meritorious improver, the application of the rule '*ut res magis valet quam pereat*,' which has been sustained in so many cases in this court. (Citing cases.)"

The claims here under discussion are not anticipated by Firestone's Patent No. 2280226.

### Validity of Claims 20 and 26 of Patent No. 2.

■ These claims are for a combination of damping means and the heterodyne amplifier. As shown by the evidence, the incorporation of these elements in the apparatus of Patent No. 2 makes possible the discovery of flaws located close to the surface of the part under inspection. Defendants contend that the combination is an old one and they restate their arguments that both elements were anticipated by the prior

art. It is unnecessary to repeat the findings hereinabove made as to the alleged anticipation of the damping means and the heterodyne amplifier considered as separate elements. Defendants' argument that the combination is an old one is not supported by the references cited by them. None of such references shows the combination. Nor can the inclusion of both elements in the device be considered as a mere aggregation. The proper test to be applied was laid down by Judge Learned Hand in Sachs v. Hartford Electric Supply Co., 2 Cir., 47 F.2d 743, 748, where inter alia he said:

"* * * The co-operation of the means necessary to create an invention is to be measured by the purpose to be fulfilled, not by the interaction of the parts. Each factor must indeed be a condition to that result, but the whole may be a mere assemblage; the co-operation between them all may be no more than their necessary presence in a unit which shall answer a single purpose."

I hold that combination Claims 20 and 26 are valid.

Validity of Claim No. 7 of Patent No. 2. Claim No. 7 reads:

"A voltage train generator comprising a condenser, means for charging said condenser, a grid controlled discharge tube having its plate connected to one terminal of said condenser and its cathode connected through a resistor to the other terminal of said condenser, an oscillatory circuit connected in parallel with said resistor, a pair of output terminals connected to said oscillatory circuit, and means for periodically discharging said condenser through said tube."

Among the prior art cited by defendants and not cited by the Patent Office are the Langevin Patent No. 1858931 and an article in The Hydrographic Review of 1934, the Newhouse patent No. 2083344, an article by Everett in the standard textbook "Communication Engineering" published in 1937, and the Gunn Patent No. 2461543. Both Langevin and the Hydrographic Review disclose an oscillatory circuit similar to that in Claim No. 7 but both such references use a spark gap or spark break. Defendants claim that these elements of the references are the equivalent of the grid controlled discharge tube of Claim No. 7. However, the evidence shows that the uniformity of repetitive action of a grid controlled gas tube which is essential to the effective operation of the apparatus of Patent No. 2 cannot be obtained by the erratic action of a spark break. Nor is the resistor disclosed in Patent No. 2 found in Langevin or the Hydrographic Review. Nevertheless it was shown by the uncontradicted testimony of defendants' expert witness that the Newhouse patent discloses a grid controlled gas tube and it would be an obvious expedient to combine such a grid controlled tube with the oscillatory circuits of Langevin or the Hydrographic Review. Moreover, Firestone testified that the Gunn patent discloses a grid controlled gas tube connected to one terminal of the condenser with its cathode connected through a resistor to the other terminal of the condenser as shown in Claim No. 7. Obviously these elements in Gunn, which perform the same function as the spark break and associated elements of Langevin and Hydrographic Review, could be substituted therefor. It is also obvious that the oscillatory circuits of Langevin and Hydrographic Review could be used in Gunn. It appears, therefore, that Claim No. 7 is fully anticipated by the above cited references and that the development of the voltage train generator of Patent No. 2 did not constitute invention.

In view of the above determination, I find it unnecessary to consider whether the impedence matching network of Everett could be used effectively with the device of the Gunn patent.

I hold that Claim No. 7 of Patent No. 2 is invalid.

### The Validity of Patent No. 2467301
### (Patent No. 3)

Patent No. 3 is entitled "Supersonic Inspection for flaws lying near the surface of a part." The title of the patent indicates in large part its purposes. In the first paragraph of the patent reference is made to the difficulties encountered in detecting flaws lying closer to the sending crystal than one-half inch by using the apparatus described in Firestone's Patent No. 2280226. It was the purpose of the invention described in Patent No. 3 to obviate the difficulties experienced in the use of Patent No. 1. Patent No. 3 teaches that these results are accomplished by interposing a delaying member between the transducer and the part to be inspected. The patent discloses three arrangements to obtain the delay by a solid intermediate member and a further method of accomplishing the same result by interposing liquid between the crystal and the part to be inspected. Defendants contend that the patent discloses no values and for that reason is invalid. This contention presupposes erroneously the necessity of disclosing the ohms, farads and other electrical measurements but, as hereinbefore noted, the specifications of the patent are addressed to those skilled in the art and it appears that such persons would have no difficulty in understanding the patent and how to use it. This is sufficient. Mowry v. Whitney, 14 Wall. 620, 624, 20 L.Ed. 860. See also Hazeltine Research v. Avco Mfg. Co., D.C., 126 F. Supp. 595, affirmed 7 Cir., 227 F.2d 137, supra. The significant relationships of the elements are clearly stated and may be constructed to any desired scale. Defendants' argument that the disclosures in the patent indicate that water would not be suitable as an intermediate member is without merit. It is true that the patent specifies "a liquid which preferably attenuates supersonic waves." It is also true that Dr. Firestone testified that "water would not attenuate waves enough to reduce repeated reflections." However, he also testified that by following the proportions shown on the drawings no difficulties would arise from repeated reflections. He pointed out that the spacing between the crystal and the part under inspection as shown on the various drawings of the patent was larger than necessary to provide for the reduction of multiple reflections. There would seem to be no doubt the patent discloses that the invention may be practiced by the use of water as the interposed member.

By way of alleged anticipation, defendants rely upon the German publication of Stocks and Rust in combination with the depth sounding device shown in Fig. 134–A of Bergman's book published about 1938. They also rely on two figures shown in the Scientific American published in 1944 and the translation of an article in the German language published by A. Goetz in 1943. None of the above references are pertinent. None of them, except Stocks and Rust, shows the use of wave trains or the use of waves reflected back to a crystal. The same infirmities of Stocks and Rust as a reference against Patent No. 1 which are hereinabove noted are present in that publication as a reference against Patent No. 3. That publication deals with the measurement of the depths of the ocean and while the operation of the device therein described discloses measurement of time intervals it does not relate to the pulse echo system of timing the reflections from flaws in a bounded solid part. One of the two figures shown in the Scientific American is a summary of Firestone's No. 1 patent. The other relates to substantially the same apparatus attributed by Bergman to Sokolov and shows the use of continuous ultrasonic waves. Furthermore, none of the references evidences any appreciation of the existence of the problem solved by Firestone in his Patent No. 3. Firestone was the first to provide an interposed delay member which made possible the detection of flaws very close to the surface of the part under inspection. This constituted invention and marked a notable

920

advance in the art of non-destructive testing by the ultrasonic pulse echo method.

Patent No. 2467301 is valid.

Claim No. 2 of Patent No. 2592134 (Patent No. 4)

Claim No. 2 reads:

"The method of inspecting the interior of a solid part, which consists in transmitting a supersonic wave through a liquid which is in contact with the solid part, varying the angle of incidence of the wave for scanning a cross-sectional area of the solid part, and detecting waves emerging from the solid part into said liquid with an angle of emergence equal to the aforementioned angle of incidence."

The reference cited by defendants against Claim No. 2 are the Mulhauser German patent No. 569598, the Helvetica Physica publication of 1937, the Bergman Book and the translation of the Goetz German publication also cited against Patent No. 3. Defendants rely almost entirely on Goetz. That reference is a lengthy and highly technical discussion entitled "Passage of sound through metal plates in fluid with oblique incidence of a plane wave." However, the essential and basic difference between Goetz and Claim No. 2 of the patent in suit may be stated briefly. Goetz shows that in the transmission of ultrasonic energy at an oblique incidence through a plate of unspecified material placed in liquid the incident and emergent waves will be parallel. The plate, however, is mounted for rotation on a vertical axis and is placed between the sound wave generator and the receiver. The transmitter and receiver are on opposite sides of the plate and the only waves detected are those that emerge into the liquid on the side of the plate opposite to that at which the sound energy entered the plate. This arrangement requires a two crystal embodiment, the receiving crystal being on the side of the plate opposite the transmitter.

Claim No. 2 discloses the sound wave being transmitted through a liquid which is in contact with the part; varying the angle of incidence of the wave for scanning a cross-sectional area of the part and detecting waves emerging from the solid part into said liquid with an angle of emergence equal to the angle of incidence. Under the teaching of Claim No. 2 supersonic waves emerge from the workpiece after reflection at a flaw therein at their point of entry into the workpiece and travel back to the crystal over the same path taken by them in traveling from the crystal to the workpiece. The detected waves emerge from the part into the same portion of the liquid through which they entered the part. With such an arrangement the scanning of a cross-sectional area of a solid part with a single crystal is feasible. However, the scanning taught in Claim No. 2 cannot be practiced with the two crystal embodiment of Goetz because of the impracticability of effecting the essential coordinated motion of the receiving crystal. Thus there is a substantial patentable distinction between Goetz and Claim No. 2 of the patent in suit. None of the other references anticipate the claim in suit.

I hold Claim No. 2 of Patent No. 4 is valid.

### Infringement

As stated at the outset of this opinion, defendants principal defense against the charge of infringement is that the Immerscope follows the teachings of the prior art rather than the disclosures of the Firestone patents. In view of the determinations hereinabove made on the issue of anticipation, no further comment is necessary to demonstrate the inadequacy of that defense. Defendants also urge specifically that Firestone Patent No. 1 is limited to contact testing, whereas the Immerscope is employed in testing parts immersed in water and that this difference in method is sufficient to avoid infringement of Firestone Patent No. 1. In contact testing a thin film of oil is placed between the crystal and the

part under test. The film of oil serves as a liquid connection between the crystal and the part under test and provides a contact effective to propagate the ultrasonic waves into the part and to transmit the echo waves from the part back to the crystal. In an experiment conducted at the trial it was demonstrated that there can be no effective accoustical contact if a dry crystal is placed directly on the dry metal of the workpiece. It was shown that if the desired results are to be obtained, it is necessary that a thin film of oil or other liquid be placed between the crystal and the part under inspection. Immersed testing is a convenient but not an entirely accurate description of under-water testing. In such form of testing it is not essential that the part being tested be submerged in water. The same results are obtained when a stream or column of water is placed between the crystal and the part. The water which is interposed between the crystal and the part supplies the effective contact necessary to provide means for transmitting a supersonic wave into the part as required by the claims of the patent. The similarity of the two types of testing was outlined by deposition witness Bendz, who said:

"These techniques (immersion and contact inspection) only differ by the amount of medium between the transducer and the material to be inspected. In contact inspection there is little material known as a film. With immersed inspection there is considerably more of a medium known as a couplant which is usually water. The physical connection between the transducer and the material being tested is referred to as the 'water path.'"

Immerscopes are used for both immersed and contact testing. When the Immerscope is used for contact testing no change is made in the instrument itself, the only change being in the type of crystal used. It is true, however, that immersed testing has several advantages over contact testing. By the former method it is practicable to inspect irregularly shaped articles, such as forgings and castings, without grinding the rough surfaces. Immersed testing results in more accurate observations of the reflections from flaws close to the surface of a part and such form of testing insures longer life for the expensive high frequency crystals used in underwater testing. In the foregoing respects, immersed testing is an improvement on the type of testing taught by Firestone Patent No. 1. However, it is no defense that an infringing device is an improvement if the exclusive features found in the patent in suit have been adopted. Chesapeake & Ohio R. Co. v. Kaltenbach, 4 Cir., 95 F.2d 801. The applicable principle, as stated in Walker on Patents, Deller's Ed., Vol. 3, p. 1691 is as follows:

"One who appropriates or manufactures and uses a patented invention or the substance thereof without the consent of the patentee does not escape or avoid infringement by improving upon the invention or using an improvement made by another. Tempco [Temco] Electric Motor Co. v. Apco Mfg. Co., 275 U.S. 319 [48 S.Ct. 170, 72 L.Ed. 298]; Hobbs v. Beach, 180 U.S. 383 [21 S.Ct. 409, 45 L.Ed. 586]; Boyden Power-Brake Co. v. Westinghouse, 170 U.S. 537 [18 S.Ct. 707, 42 L.Ed. 1136]."

Defendants argue that the Immerscope uses the echo system of depth sounding devices such as those shown by Stocks and Rust publication. They contend that any doubt as to the equivalence between a metal part and the mud and clay at the bottom of the ocean should be resolved favorably to the defendants by combining Stocks and Rust with the teachings of Sokolov. However, the only immersion testing taught by Sokolov is continuous testing which differs substantially from the methods of contact and immersion testing taught by Firestone and used in the Immerscope. Defendants also contend that the cathode ray oscilloscope linear sweep system used in the Immerscope follows the teachings of such prior art references as the Verman

publication and the Smith patent No. 2143035. In view of this Court's findings on the issue of validity, this argument must be rejected. That the above elements were old is shown not only by defendants' references but by the file wrapper references of Hart No. 1979225 and McSpadden No. 2172395 and also by Patent No. 1 itself. The linear sweep and cathode ray oscilloscope were old components of the new combination of Patent No. 1. By their use in the Immerscope defendants do not follow the prior art but infringe Patent No. 1. Nor do defendants avoid infringement of Claim No. 4 of Patent No. 1 because that claim provides for a receiving transducer as well as a sending transducer while only one is used in the Immerscope. Patent No. 1 explicitly recites that one such structure may serve the functions of both. Patent No. 1 covers a pioneer invention in the pulse echo ultrasonic method of non-destructive testing and is entitled to a broad range of equivalents. Southern Saw Service v. Pittsburgh-Erie Saw Corp., 5 Cir., 239 F.2d 339.

The accused apparatus, as described in the Stipulation, responds to Claims 2, 3, 10 and 11 of Patent No. 1 and defendants do not seriously contend otherwise. Under the broad range of equivalents to which Patent No. 1 is entitled "effective contact," as that term is used in the patent, means accoustically effective contact.

I hold that Claims 2, 3, 4, 10 and 11 of Patent No. 1 are infringed.

### Infringement of Patent No. 2

The Micarta backing on the crystal of the Immerscope constitutes a damping means corresponding to Claims 19 and 32 of Patent No. 2, which provide means for absorbing vibrations of selected frequency in effective contact with the other principal surface of the quartz plate as taught in Patent No. 2. Here, again, in view of the findings above made on the issue of validity, it must be held that defendants do not follow the prior art but infringe Claims 19–32 of Patent No. 2.

### Claims 16, 25 and 29 of Patent No. 2

Claims 16, 25, 29 of Patent No. 2 provide for a heterodyne amplifier whose intermediate frequency is higher than the signal frequency. As hereinabove indicated, the function of such an amplifier is to reduce substantially the "blocking" or loss of sensitivity resulting from the application of the transmitted voltage. The Immerscope also has a heterodyne amplifier the intermediate frequency of which is higher than the signal frequency. In addition, the Immerscope has a radio frequency amplifier involving no change in frequency and video amplification at the output end of the intermediate frequency amplifier. However, the weight of the evidence shows that in using the heterodyne amplifier in the Immerscope defendants receive the benefit of its rapid recovery of sensitivity as taught by Firestone. A device adopting the features of a patent can not escape infringement by merely adding other features thereto. Holland Co. v. American Steel Foundries, 7 Cir., 190 F.2d 37. See Chesapeake & Ohio R. Co. v. Kaltenbach, supra, and Aluminum Co. of America v. Thompson Products, 6 Cir., 122 F. 2d 796; Kelley-Koett v. McEuen, 6 Cir., 130 F.2d 488.

I hold that the heterodyne feature of Claims 16, 25 and 29 are infringed.

It follows from such determination and the ruling that defendants do not avoid infringement of Claims 19–32, involving damping, that combination Claims 20–26, which provide for both a damping means and a heterodyne amplifier, are likewise infringed by their use in the Immerscope.

Contact testing is employed in using the apparatus of Patent No. 2 but, for the reasons stated above, the accused device, when used in under-water testing, does not, by such use, avoid infringement of Patent No. 2.

Although Claim No. 7 of Patent No. 2 has been held invalid, the question whether such claim would be infringed if held valid will be examined.

It is not claimed that the accused device generates voltage trains

corresponding to those described in Claim 7 except in those instances where defendants use a long cable with the Immerscope and add thereto a search tube and peaking coil. When used with a short cable and no peaking coil the Immerscope does not operate on the oscillatory circuit shown in Claim 7. However, when a long cable, together with a search tube and peaking coil, are used the voltage of the Immerscope is transformed from a unidirectional pulse to a train of voltage oscillations that correspond with the voltage trains of Claim 7 of the patent in suit. Such transformation is shown by testimony of plaintiffs' witnesses, a demonstration in court, a photograph of the results of the demonstration and exhibits that diagramatically illustrate the oscillatory nature of the wave form developed across the crystal of the Immerscope by the use of the peaking coil. It is claimed by defendants that the peaking coil which compensates for the increased length of cable is used for the sole purpose of obtaining sharper and more discrete signals, referred to during the trial as "pips," on the oscilloscope. Prosek, Chief Technician of Alcoa, testified in effect that the signals or "pips" shown when a short cable is used will decrease in height with the use of a longer cable unless in the latter procedure a peaking coil is used to compensate for the added capacitance of the longer cable. Van Valkenberg, the electrical expert of Sperry, conceded that when a longer cable is used an increase in the height of the signals is obtained by the use of a peaking coil. Van Valkenberg also testified that if properly adjusted, a peaking coil would increase the "pip height" when used with a shorter cable as well as a longer one. While it is not shown that defendants used the peaking coil except with longer cables, such use is not infrequent. Van Valkenberg demonstrated the use with an Immerscope of a peaking coil and a cable attachment 9' 6" long. He stated that as shown on a photograph of the demonstration the voltage oscillations were at a frequency of approximately 3 megacycles

when operating with a crystal of 5 megacycle frequency. Defendants contend that this is a departure from the teachings of Firestone Patent No. 2 that the generator should be tuned at or near the natural frequency of the crystal. I am not persuaded that such difference in frequency, as shown by the demonstration, avoids infringement. The evidence shows that plaintiffs also use an impedance matching device on occasions when their Reflectoscope is connected with a short cable. The over-all effect of such matching device as used in the Reflectoscope is to increase the sensitivity of the entire instrument. By using a peaking coil with an Immerscope defendants increase the sensitivity of the accused device and secure that result by means of an oscillatory circuit which is the substantial equivalent of the circuit disclosed by Claim 7. Although Patent No. 2 and Claim 7 thereof are for improvements on a basic patent, the claim is entitled to a substantial range of equivalents. Wine Railway Appliance Co. v. Baltimore & Ohio R. Co., 4 Cir., 78 F.2d 312; Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912; Jay v. Suetter, 9 Cir., 32 F.2d 879.

I hold that if contrary to the finding hereinabove made Claim 7 of Patent No. 2 were held valid, the Immerscope, when used with a peaking coil and search tube, would infringe the claim.

### Infringement of Patent No. 3

The interposition of water between the crystal and the part being inspected as a delaying member is taught by Patent No. 3. Such delay member is used in the accused device when employed in under water testing. The apparatus used, the function performed and the results obtained by the Immerscope are the equivalent of, if not identical with, those disclosed by Patent No. 3. That the accused device infringes the claims of Patent No. 3 is beyond question.

### Infringement of Claim 2 of Patent No. 4

The question of infringement of Claim 2 of Patent No. 4 is whether, in the use of the accused device by defendant Alcoa,

a cross-sectional part of the workpiece is scanned as provided in the claim. In testing a workpiece for flaws the defendant makes a preliminary inspection in the normal way by propagating waves perpendicularly from the crystal into the piece. If a flaw is discovered an evaluation of the flaw is made by moving the crystal over the face of the piece in a manner that will keep the sound waves focused on the flaw in order to obtain the maximum indication. The angle of incidence of the crystal is varied within a maximum of 6 degrees. This variation may be either in a clockwise or counterclockwise direction. The evidence shows that if the search tube on which the crystal is mounted is changed from perpendicularity by 6 degrees the longitudinal waves within the piece will depart from perpendicularity by approximately 27 degrees. Defendants do not vary the incidence of the wave for the purpose of scanning a cross-sectional part of the piece but, as indicated, this is done with the object of evaluating flaws previously detected. Nor has it been shown that by the above method defendant, Alcoa, has ever discovered a flaw not previously detected in the normal manner by propagating waves from a crystal located at right angles to the workpiece. However, the procedure adopted by defendants results in the scanning of a substantial cross-sectional area of the part, as taught by Claim 2. That claim does not require that the angle of incidence of the sound wave be varied by any specified degree nor does it require that the crystal be rotated without being moved over the face of the piece. The fact that there is not precise identity in defendant's method and the method described in Claim 2 is not sufficient to avoid infringement. As said in Kansas City Southern Ry. v. Silica Products Co., 8 Cir., 48 F.2d 503, 508:

"One does not escape infringement by practicing the invention imperfectly."

I hold that Claim No. 2 of Patent No. 4 is infringed.

Infringement by Use of B Scan

Defendants also manufacture and sell a B Scan device which is used in combination with the A Scan unit of the Immerscope and which, when so used, simultaneously registers the reflections from flaws in the workpiece. The reflections from flaws detected by the use of the Immerscope appear on the screen of the A Scan unit of the Immerscope as so-called "pips" of varying heights. As presented on the auxiliary B Scan unit such reflections appear as horizontal lines. Firestone makes no claim that the B Scan, as such, is his invention. However, the horizontal presentation of reflections from flaws on the auxiliary B Scan unit is the result of the use in the Immerscope of the substance of the inventions described in Firestone's Patents Nos. 1, 2 and 3. Such use infringes the valid claims of Patents Nos. 1, 2 and 3 to the same extent as the Immerscope itself. Claim 4 of Patent No. 1 is not excepted from the above finding. The "brightening display" of the B Scan, which is common to the type of display on television sets, does not read on Claim 4 of Patent No. 1, which discloses an oscilloscope whose spot is deflected in one direction by the sweeping circuit and in a different direction by the voltage output from the receiving transducer. However, under the broad range of equivalents to which a basic patent is entitled, the B-scan must, in the circumstances of its use with the Immerscope, be held to be an infringement of the valid claims of Firestone's Patents Nos. 1, 2 and 3.

To summarize, Claims Nos. 2, 3, 4, 10 and 11 of Patent No. 2280226, Claims Nos. 16, 19, 20, 25, 26, 29 and 32 of Patent No. 2398701, Claims Nos. 1, 2 and 3 of Patent No. 2467301, and Claim No. 2 of Patent No. 2592134 are valid and infringed. Claim No. 7 of Patent No. 2398701 is held to be invalid but, if valid, would be infringed.

Defense of Misuse of the Patents and the Counterclaim Based on Alleged Violation of the Antitrust Laws

The defense and the counterclaim rest upon the same facts but the defense of

misuse is asserted by both defendants whereas the antitrust counterclaim is asserted only on behalf of Electrocircuits.

The defense of misuse and the counterclaim are predicated broadly on defendants' contention that Sperry's purpose in instituting this suit for infringement was to obtain a monopolistic control of the market for ultrasonic pulse echo devices for flaw detection over and above the limited monopoly embraced within the terms of the patents.

In support of such contention defendants direct a multiplicity of charges against Sperry's general policies and practices in relation to the patents in suit and its foreign patents in the field of ultrasonics. Standing alone, many of defendants' allegations are devoid of merit and warrant but scant consideration. It is defendants' claim, however, that, considered as a whole, the challenged practices demonstrate Sperry's consistent purpose to enlarge its monopoly beyond the scope of the grants of the Patent Office and unlawfully to suppress competition. It is Sperry's position that in the use, manufacture and sale of the patented devices and method, and in the institution of this suit for infringement it was motivated by no other purpose than the protection and preservation of its lawful right to exclude others from making, using or selling the inventions disclosed by the patents in suit. An outline of defendants' several complaints is set forth in the Statement of Facts which will be supplemented to the extent necessary in the discussion of the various charges.

The Sperry Corporation was organized in 1928 by Dr. Elmer G. Sperry, a noted inventor, who died within a few years after the organization of the company. At the outset, the corporation's efforts were directed to developing and marketing the inventions of its founder. Throughout the ensuing years Sperry has expanded its operations along the same general line, engaging in research, developing, manufacturing and marketing of a number of inventions of members of its own staff and others. The company has prospered generally and is now a medium-sized corporation, having about 450 employees and 8 branch offices in the United States. The shares of the corporation are closely held by the heirs of Dr. Sperry except for a small interest held by J. B. Farwell, President of the corporation.

At an early date in its history, the company established the Sperry Rail Service for the detection of flaws in the tracks of the railroads. Such inspection is done by the use of railroad cars with trained crews who make inspections of thousands of miles of tracks by the induction method of flaw detection. Today Sperry maintains a fleet of 19 cars for this purpose. Although Sperry does about 70% of all rail testing in the United States, its actual and potential competitors, including the railroads, have a total of 22 cars designed and used for rail testing. As a result of its experience in rail testing, Sperry became interested in the detection of flaws in materials used in industry and, for a period of over ten years and at considerable expense, attempted to develope a satisfactory method of inspecting metal parts. The company was unsuccessful in this regard until it learned of and acquired the rights under the Firestone patents in suit. Since that time Reflectoscopes embodying the features of these patents have been sold by Sperry in the approximate number of 1,100, about 136 of which were sold to the railroads.

Sperry is also engaged in the commercial testing business. This is a service by which the company uses its patented devices and other instruments in testing materials for others either in various manufacturing plants or in Sperry testing laboratories. There are about 150 individuals and corporations engaged in the business of commercial testing. The most recent information on the subject shows that the gross annual volume of such business by the 60 largest companies engaged therein is approximately $37,000,000. Sperry does only about one percent of all commercial testing. Sperry refuses to sell its patented devices for

pulse echo ultrasonic testing to its competitors in the commercial testing business. Such refusal is the basis of one of the defendants' many charges of misuse and antitrust violation.

During the years, Sperry has acquired about 65 patents and has 25 pending applications for patents in the field of ultrasonics. This accumulation is also one of the practices against which defendants inveigh. On the name plates of the Reflectoscopes manufactured by Sperry appears the statement "manufactured under one or more of the following patents." Listed thereunder are the numbers of many patents, some of which have no application to the device in question. Defendants assail this practice as an "attempt to scare, off competition." In the 15 years since Sperry acquired the first Firestone patent, it has sent five notices of infringement to others. None has resulted in litigation. Defendants regard these notices as threats of suit which constitute ·an integral part of a plan to violate the antitrust laws.

Sperry also manufactures a special patented transducer known as an Angle Beam Search Unit. This transducer is covered by Patent No. 2527986, which is not one of the patents in suit.

Originally this unit was sold with a tag affixed, bearing the legend "licensed only for use at 36°." This practice was discontinued at the end of 1952. Thereafter, for about three years, these instruments were licensed under a form of lease which limited the use of the search units to those not engaged in commercial testing and in the case of the railroads, to the inspection of their rolling stock. At the end of 1955 the licensing of the units was abandoned. Defendants contend that the original practice of attempting to restrict the use of the search units that were sold as well as Sperry's subsequent practice of restricting the use of such units under the leasing arrangement was unlawful. Defendants contend further that, inasmuch as the search units are used only in connection with Reflectoscopes covered by the patents in suit the restricted use of such units is in effect a restriction on the use of the Reflectoscope and constitutes a misuse of the patents in suit.

Reference was made at the outset of this opinion to the course of dealing between Sperry and Electrocircuits in connection with the manufacture and sale by the latter of a Wide Band Converter which is used for underwater testing of materials by the pulse echo ultrasonic technique. As hereinafter noted, an arrangement was effected by which Electrocircuits was permitted by Sperry to sell its Wide Band Converter but for use only in conjunction with Sperry Reflectoscopes. After the arrangement had been in effect for several months, Electrocircuits incorporated a B Scan device in the wide band converter. This was considered by Sperry to be a breach of the agreement of the parties and an infringement of Sperry patents and Sperry so informed Electrocircuits. The events that followed which culminated in Electrocircuits' decision to manufacture and sell Immerscopes and risk an infringement suit by Sperry will be recited in a discussion of the defendants' charge that Sperry misused the patent and violated the antitrust laws in its dealings with Electrocircuits.

After obtaining patents in the United States, Sperry, and in some instances Dr. Firestone, applied for and obtained patents in several European countries. For a while Sperry attempted, through its Sales Department, to market its products abroad and to obtain royalties by licensing its foreign patents. These efforts, however, were not successful and in March 1954 Sperry entered into an agreement with Resources and Facilities Corporation (hereinafter Refac). By the terms of the agreement, Refac was granted an exclusive license under Sperry's foreign patents with full power to grant sub-licenses for the use of the ultrasonic devices covered by such patents. Refac negotiated sub-licenses with various companies in Germany, France, Belgium, Italy and other European countries as well as an agreement with T.K.S. of Tokyo, Japan, all with the approval of

Sperry. In addition to the payment of royalties, the sub-licenses provide for an exchange of patent rights and technical information between Sperry and the sub-licensees. Some of the licenses contain covenants by the licensees not to contest Sperry's foreign patents or applications therefor and to assign to Sperry the rights of the licensees in any future patents or applications. Additional relevant facts will appear in the discussion of defendants' charge that such licenses by their terms violate the antitrust laws of the United States and constitute a misuse of the patents in suit.

Finally, it is charged by defendants that the institution of this suit for infringement "was intended to do away with any and all domestic competition."

### Refusal to Sell Reflectoscopes for Commercial Testing

 It is difficult to understand the logic of defendants' position in respect of Sperry's refusal to sell Reflectoscopes to its competitors in the commercial testing business. Sperry manufactures and sells Reflectoscopes to others for use by the purchasers in testing their own products. All such sales are made without restriction. Sperry is also engaged in the commercial testing business, in the operation of which it uses testing instruments available to all. In addition, Sperry also uses its own Reflectoscopes, which are covered by the patents in suit, for testing by the pulse echo ultrasonic technique. Defendants concede that a patent is the grant of the right to exclude others from using the invention but they advance the novel argument that a refusal to sell the inventions for the purpose of preventing competition with the patent owner in their use is an unlawful enlargement of the grants. Merely to state the argument is to expose its fallacy. The argument rests on the presupposition that by its exclusive use of the patented devices in its commercial testing business, Sperry obtained an unfair advantage over its competitors in such business. However, the advantage that Sperry enjoys is the result of a right conferred upon it by the Constitution and statute, and takes nothing from its competitors to which they were entitled under the law. The monopoly of a patent is distinguishable from a monopoly, as that term is used generally, and in the antitrust laws. The distinction was delineated by the Supreme Court in United States v. Dubilier Condenser Corp., 289 U.S. 178, 186–187, 53 S.Ct. 554, 557, 77 L.Ed. 1114, as follows:

"Though often so characterized a patent is not, accurately speaking, a monopoly, for it is not created by the executive authority at the expense and to the prejudice of all the community except the grantee of the patent. Seymour v. Osborne, 11 Wall. 516, 533, 20 L.Ed. 33. The term monopoly connotes the giving of an exclusive privilege for buying, selling, working, or using a thing which the public freely enjoyed prior to the grant. Thus a monopoly takes something from the people. An inventor deprives the public of nothing which it enjoyed before his discovery, but gives something of value to the community by adding to the sum of human knowledge"

 Defendants add no force to their contention by citing out of context excerpts from authorities holding that the possession of a patent gives the patentee no exemption from the provisions of the antitrust laws. United States v. Line Material Co., 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701. It is settled law that a patentee may not enlarge the scope of his grant by tying other products, patented or unpatented, to the sale or use of the patented device. Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363; Mercoid Corp. v. Mid-Continent Inv. Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376; Hartford-Empire Co. v. United States, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322. Nor may the patentee use the patent as a means of controlling resale prices or restricting customers. United States v. Bausch & Lomb Optical Co., 321 U.S.

707, 64 S.Ct. 805, 88 L.Ed. 1024. It is axiomatic that a patent may not be used to restrain competition or to monopolize trade in goods not covered by the patent. All of defendants' citations are wide of the mark. Sperry does not sell to some testing laboratories and discriminate against others. Sperry has no agreements with any of its competitors calculated to restrain competition or unlawfully monopolize any part of the business of commercial testing. It simply reserves to itself its own patented devices for its own use in the commercial testing business. Sperry does no more than the Supreme Court, in Mercoid Corp. v. Mid-Continent Inv. Co., supra [320 U.S. 661, 64 S.Ct. 271], said a patent owner had the right to do, i.e. "to be free from competition in the practice of [his] invention." In Hartford-Empire Co. v. United States, supra [323 U.S. 386, 65 S.Ct. 395], the Supreme Court stated the rights of a patent owner thus:

"A patent owner is not in the position of a quasi-trustee for the public or under any obligation to see that the public acquires the free right to use the invention. He has no obligation either to use it or to grant its use to others. If he discloses the invention in his application so that it will come into the public domain at the end of the 17 year period of exclusive right he has fulfilled the only obligation imposed by the statute. * * * This has been settled doctrine since at least 1896."

And, as said in United Shoe Machinery Corp. v. O'Donnell Rubber Products Co., 6 Cir., 84 F.2d 383, 386:

"It has long been settled that, in the United States, exclusion of competitors is the very essence of the right conferred by a patent."

See also Byers Machinery Co. v. Keystone Driller Co., 6 Cir., 44 F.2d 283.

That Sperry's lawful advantage had no substantial effect upon its competitors is evidenced by the fact that Sperry does less than one percent of the commercial testing business in the United States.

Notwithstanding Sperry's policy of not selling to its competitors, it was shown that Magnaflux Corporation, a competitor, has obtained and was using two Reflectoscopes in its laboratory. These devices were procured from original vendees of Sperry and were being used without any protest or objection by Sperry. There is no evidence that any competitor in the commercial testing business was sued or threatened with suit by Sperry nor has it been shown that defendants have suffered any injury by reason of the practice of which they complain. I hold there was no misuse of the patents in suit, or any violation of the antitrust laws in Sperry's refusal to sell its patented devices to its competitors in the commercial testing business.

Accumulation of Patents

Defendants attack Sperry's accumulation of patents as being motivated by the purpose to secure an unlawful monopoly of the pulse echo ultrasonic method of non-destructive testing. Sperry has 65 patents in the field of ultrasonic testing, with 25 applications pending. In addition, it received 16 applications from sub-licensees of its foreign patents but this number had dwindled to 2 applications, with only one claim allowed. It has also received other rights from its Belgian licensee but these relate to specific types of transducers rather than to pulse echo systems of flaw detection. Sperry has no policy of acquiring patents from others, particularly competitors, to block the entry of anyone into the field of ultrasonic flaw detection. Its ownership of the basic Firestone patent covering the pulse echo method is the result of Firestone's attempt to interest the Sperry Gyroscope Company in his invention and the suggestion by that company that Firestone submit a proposal to plaintiff Sperry Products Company. Upon acquiring this basic patent it followed as a matter of course that Sperry acquired rights in the subsequent Firestone patents covering improvements on the original invention. Many of its other patents in this field cover various types of transducers and

other auxiliary equipment. Sperry has its own staff of engineers and inventors. Its patent committee meets several times a year and follows the policy of filing applications only on its inventions which can be put into use. Of over 300 inventions submitted to the committee only 136 were found to conform to the above policy and applications filed. Magnaflux Corporation, with a different flaw detection system, has 57 patents and 20 pending applications. Defendant Electrocircuits has 4 patents, one of which covers that defendant's F-M system of ultrasonic flaw detection, which the defendant does not use. There are 44 patents on ultrasonic flaw detection devices owned by others. Sperry is currently using more than one-third of its patents, which is higher than the national average of 30%. As said in Hartford-Empire Co. v. United States, supra [323 U.S. 386, 65 S.Ct. 395], a patentee of an invention "has no obligation either to use it or grant its use to others."

Defendants have not shown any illegal purpose in the size of Sperry's patent portfolio. In Automatic Radio Manufacturing Co., Inc. v. Hazeltine Research, Inc., 339 U.S. 827, 70 S.Ct. 894, 898, 94 L.Ed. 1312, the Supreme Court said "the mere accumulation of patents, no matter how many, is not in and of itself illegal." Defendants have failed to show that Sperry's accumulation of patents is unlawful, or that either defendant has sustained any injury by reason thereof.

### Markings on the Name Plates

Defendants contend there is a misuse of the patents in suit in the practice of placing on the name plates of the Reflectoscopes a list of patents in addition to those embodied in such devices. Manifestly there is no misuse of the patents in suit by listing them on the name plates of the Reflectoscopes. Misuse which constitutes a defense is a misuse of the patents in suit. Apex Electrical Mfg. Co. v. Altorfer Bros. Co., 7 Cir., 238 F.2d 867.

Lipschutz, patent attorney for Sperry, testified that he was responsible for the listing of patents on the name plates and that he followed the practice adopted by many other corporations, including General Electric Company, from whose name plates he copied the words "Manufactured under one or more of the following patents." Lipschutz also submitted a sound and reasonable explanation of the practice. There are about 20 different types of patented accessories and additional patents covering methods that can be used with Reflectoscopes. The selection of accessories and methods to be used with the Reflectoscopes is, of course, determined by the various needs and wishes of the purchasers of such instrument. The listing of all such patents on the name plates is a time and labor-saving expedient which nevertheless fully informs any potential competitor of the extent of Sperry's patent holdings. According to Lipschutz, the alternative to the above practice would be "to sit down with an engineer and salesman each time an instrument was sold and make a separate and different name plate for such instrument." The practice followed by Sperry is an old one. See National Folding-Box & Paper Co. v. Elsas, 2 Cir., 1898, 86 F. 917; also see Chicago Pneumatic Tool Co. v. Hughes Tool Co., 10 Cir., 1951, 192 F.2d 620. Defendants' suggestion that anyone reading the list of 50 patents "obviously would be frightened at the cost of investigating and would very likely go no further," finds no support in the evidence. Electrocircuits was not frightened, nor was Alcoa. Cline, who was in charge of standardizing equipment purchases for Alcoa, said he never looked at the name plates. Defendants have not sustained their claims of misuse, or antitrust violation in Sperry's use of the name plates, nor has either defendant sustained any injury by reason of such practice.

### Notices of Infringement

During the period of fifteen years, Sperry sent a total of five written notices of infringement. Section 287, Title 35 U.S.C.A., provides that "no damages shall be recovered by the patentee in any action for infringement,

except on proof that the infringer was notified of the infringement." In notifying infringers, Sperry was merely complying with the requirements of the statute. There is no evidence that Sperry did not act in good faith in sending such notices. In Virtue v. Creamery Package Mfg. Co., 227 U.S. 8, 33 S.Ct. 202, 208, 57 L.Ed. 393, the Supreme Court said:

> "Patents would be of little value if infringers of them could not be notified of the consequences of infringement, or proceeded against in the courts."

Defendants' claims in this connection are without substance and there is no evidence of any injury to either defendant by reason of Sperry's notices to infringers.

### Angle Beam Search Unit

Although the patent covering the angle beam search unit is not one of the patents in suit, defendants contend that because the search units are used with Reflectoscopes which are covered by the patents in suit, the restriction on the use of the former is in effect a restriction on the use of the latter. However, this falls far short of showing that the patents in suit were used to restrict the use of the angle beam search unit. In a further effort to connect the patents in suit with the restrictions in the lease, defendants assert that a plastic wedge on the bottom of the angle beam search unit serves as a delay member as taught by Patent No. 2467301, which is one of the patents in suit. However, no witness testified that the plastic wedge serves the purpose now claimed for it by defendants. But even if it did, this would not establish that one of the patents in suit was used to enforce the restrictions in the leases of the search units. It is not essential to the effective use of the invention covered by Patent No. 2467301 that it be used with the angle beam search unit. Defendants also contend that in restricting the use of the search units by the railroads to inspection of their rolling stock Sperry suppressed its ultrasonic patents in order to en-able it to "maximize its income from its induction rail service." In support of this contention they advance the argument that "Sperry was afraid that the railroads might hit upon a way of applying ultrasonics to rail testing and thus did not wish to give the railroads the angle beam search unit which might have made the adaptation of the Reflectoscope to rail testing possible." Even if this were a correct surmise of Sperry's motive it would not serve to invalidate the restriction. During the time the practice of restrictive licensing was in effect neither Sperry nor the railroads had developed a technique of inspecting rails by the use of Reflectoscopes and the only use to which the search units could be put in this connection was an experimental one. Sperry was using the angle beam search units for such purposes and as the owner of the patent it had the right to be free from competition in this field of use. Sperry also was acting within the scope of its lawful authority under the patent in restricting the use of the search units to those who were not engaged in the commercial testing business. Indeed, in view of Sperry's policy of refusing to sell Reflectoscopes to its competitors in such business, the restriction was of little or no significance. Obviously, if its competitors in commercial testing business were unable to purchase Reflectoscopes they would have no need of the angle beam search units.

The Supreme Court of the United States has approved the practice of restrictive licensing of inventions. In General Talking Pictures Corp. v. Western Electric Co., 305 U.S. 124, 59 S.Ct. 116, 83 L.Ed. 81, it was held that:

> "The owner of a patent may lawfully restrict his licensee to the manufacture and sale of patented inventions for use in only one or some of several distinct fields in which it is useful, excluding him from the others." (Headnote No. 1.)

On page 127 of 305 U.S., on page 117 of 59 S.Ct., in the opinion, the Court said:

"The practice of granting licenses for a restrictive use is an old one, see Rubber Co. v. Goodyear, 9 Wall. 788, 799, 800, 19 L.Ed. 566; Gamewell Fire-Alarm Telegraph Co. v. [City of] Brooklyn, C.C., 14 F. 255. So far as appears, its legality has never been questioned."

In Hartford-Empire Co. v. United States, supra [323 U.S. 386, 65 S.Ct. 392], the court, in discussing the provisions of the decree of the District Court [46 F.Supp. 541], said:

"Paragraph 29 should be amended to permit any appellant, corporate or individual * * * to license with restrictions, any patent hereafter applied for or acquired."

See also Williams v. Hughes Tool Co., 10 Cir., 186 F.2d 278, 285.

In view of the foregoing authorities, it must be held that the restrictions in the leases were valid. Even if this were not so, and if it were held that such restrictions constituted a misuse of the patents in suit, defendants would have no cause for complaint. As shown above, the practice of leasing was discontinued at the end of 1955 and since that time the angle beam search units have been sold without restriction.

The reason for the abandonment of said practice was stated by Manning, assistant to the president of Sperry, as follows: "We found that it just wasn't worth the bother. Of course our interest in leasing in the beginning was to protect a very substantial investment in the research and development applying to this rail and we concluded this just wasn't worth the bother and we were willing to open it up to anybody." Manning testified further that the search units were easy to make and were being made by many people. If, contrary to the views hereinabove expressed, it were held that the restrictive leasing of the search units was improper, the abandonment of such practice would remove any impediment to plaintiffs' right to proceed with their suit for infringement. Defendants argue that since such practice was in effect at the time this suit was instituted and for some time thereafter, it is too late for Sperry to purge itself. This is not the law. In White Cap Co. v. Owens-Illinois Glass Co., 6 Cir., 203 F.2d 694, 698 the Court said:

"However, the master held that the plaintiff had purged itself of the illegal practice. The fact that the objectionable provision was cancelled during the pending proceedings does not establish that the holding is erroneous. Campbell v. Mueller, 6 Cir., 159 F.2d 803. See also Standard Oil Co. v. United States, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926, in which the illegal clauses were cancelled a short time before the entry of the decree."

To the same effect are Sylvania Industrial Corp. v. Visking Corporation, 4 Cir., 132 F.2d 947; Air Products, Inc. v. Boston Metals Co., D.C., 98 F.Supp. 719; Eastern Venetian Blind Co. v. Acme Steel Co., 4 Cir., 188 F.2d 247.

For the reasons hereinabove stated, it is held that defendants have not established a misuse of the patents in suit or any violation of the antitrust laws or that any damage resulted to either of them by reason of Sperry's practices in connection with the angle beam search unit.

### Relations between Sperry and Electro Circuits

Defendants charge that Sperry misused the patent in suit by "the imposition of a tying arrangement." They also assert that Sperry enticed Electro Circuits into the field of ultrasonic pulse echo testing and subsequently attempted to expel Electro Circuits therefrom. It requires no more than a statement of the salient facts to demonstrate that both contentions are groundless. Electro Circuits was organized in California in 1951. It commenced active operations in that state in July 1951. Its first development was a weld inspection apparatus which was followed by the development of a Wide Band Converter and the Immerscope. These devices operate on the principle of the pulse echo method of ultrasonic testing. At the

time of its first development Electro Circuits attempted to secure a license under the Sperry patents in return for its agreement to purchase from Sperry unpatented sub-assemblies of the latter's patented devices. Sperry rejected this proposal. When Electro Circuits was ready to market its Wide Band Converter, Richards, the president of that company, had a conference with the officials of Sperry with a view of securing an agreement that would permit Electro Circuits to manufacture and sell its Wide Band Converter without being sued for infringement. Richards proposed that Sperry grant a license to Electro Circuits or, in the alternative, that Electro Circuits sell its Wide Band Converter to Sperry for resale by the latter. Sperry rejected both proposals. It was agreed between the parties, however, that Sperry would forebear instituting suit for infringement provided Electro Circuits sold its Wide Band Converter for use only in conjunction with Sperry's Reflectoscopes. The Wide Bend Converter was designed so that it could be "plugged in" to a Reflectoscope. Under this arrangement of joint use, only the display portion of the cathode ray oscilloscope of Sperry's instrument was used. All other functions of the dual apparatus were performed by the Wide Band Converter. The agreement remained in effect for about 9 months, during which time Electro Circuits sold 8 Wide Band Converters to owners of Reflectoscopes and one Wide Band Converter to a customer who agreed to its use with a Reflectoscope to be purchased from Sperry. In March 1953 Farwell, president of Sperry, learned through an advertisement in a trade journal that Electro Circuits was making a B Scan display in connection with its Wide Band Converter. Farwell considered this a breach by Electro Circuits of its agreement and an infringement of Sperry's patents, and notified Electro Circuits to this effect. Thereafter officials of Electro Circuits went to New York and there conferred with representatives of Sperry.

At this time Electro Circuits was negotiating with the Magnaflux Company with a view of engaging the latter to act as its distributor. In making the trip to New York, Richards stopped in Chicago and informed Magnaflux of Sperry's notice of infringement. On May 6, 1953 Richards held a series of conferences with Sperry in New York, at which time many proposals were made and rejected. It was finally agreed, however, that Electro Circuits might continue selling its Wide Band Converter and B Scan for use with the Reflectoscopes for a period of six months, after which time Electro Circuits would convert its equipment to the F-M system of ultrasonic inspection, on which it held a patent. Before returning to California, Richards again stopped at Chicago and saw the officers of the Magnaflux Company. On this occasion he learned that Magnaflux had received an opinion from a firm of patent lawyers that the Sperry patents probably were invalid. When he arrived back in California Richards requested a firm of patent attorneys in San Francisco to submit opinions on two questions: (1) whether its F-M system infringed the Sperry patents, and (2) whether the Sperry patents were invalid. The opinions received were to the effect that the F-M system did not infringe and that the Sperry patents probably were invalid. Thereafter, at the end of the six months period, Electro Circuits did not convert its equipment to the F-M system—instead it incorporated a cathode ray oscilloscope in its wide band converter and called the new self-operating unit an Immerscope. In only one instance did Sperry sell a Reflectoscope that was to be used with the Wide Band Converter. In that case Sperry imposed no condition upon the use of its instrument but merely agreed that in addition to its use in the usual manner the purchaser might also use the Reflectoscope in conjunction with the Wide Band Converter. The other eight sales of Wide Band Converters were made by Electro Circuits to owners of Reflectoscopes and Sperry merely consented to the use of its invention in the manner described above. At no time in connection with any of the transactions did Sperry attempt to en-

large its lawful monopoly under its patents. As counsel for plaintiff aptly observed, Electro Circuits "might have had something to talk about" if Sperry had acceded to the request of Electro Circuits and sold its unpatented assemblies to the latter. The cases cited by defendants are not in point. Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363; Carbice Corp. of America v. American Patents Development Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819 and Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871 are cases in which the patent owner was misusing the patent to enforce the sale of unpatented products. Black v. Magnolia Liquor Co., 355 U.S. 24, 78 S.Ct. 106, 2 L.Ed. 2d 5 and Distilled Brands v. Dunigan, 2 Cir., 222 F.2d 867, involved tie-in sales of liquor dealers. Patents were not involved in those cases. The excerpts quoted from United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 and United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 are not pertinent under the facts of this case.

Electro Circuits' claim that Sperry enticed it into the pulse echo ultrasonic testing business is repudiated completely by the facts. Electro Circuits was an active and successful petitioner of concessions from Sperry that would enable it to manufacture its Wide Band Converters free of the threat of a suit for infringement. After receiving notice that it infringed the Sperry patents by incorporating a B-scan in the Wide Band Converter, Electro Circuits succeeded in persuading Sperry to defer the institution of suit for a period of 6 months upon Electro Circuits' promise to convert to its F-M system at the end of that time. Thereafter, in violation of its promise, Electro Circuits proceeded to manufacture and sell the accused Immerscope.

I find no basis in the evidence for the charge of enticement nor do I find any evidence of a misuse of the patents in suit or a violation of the antitrust laws in Sperry's dealings with Electro Circuits.

## Plaintiff's Purpose in Filing This Suit

An examination of the above captioned subject is made at this point because of its close relation to the events referred to in the subject last discussed. It is the contention of defendants that Sperry's purpose in instituting suit was to obtain monopolistic control of the market over and above the rights granted to it under its patents. In support of this contention defendants refer to Sperry's policy of asserting its patent rights against infringers, Sperry's alleged improprieties in its relations with Electro Circuits and Sperry's alleged attempt to reserve the United States market to itself through its foreign license agreements.

As noted above, Sperry was doing no more than asserting its right under the patents in sending notices to infringers. It has also been determined above that in its relations with Electro Circuits, Sperry was guilty of no impropriety and that such charge is entirely without merit. The implication in defendants' argument that Sperry's policy of licensing its foreign patents was a part of an alleged unlawful purpose to monopolize will be hereinafter discussed. It is enough to say at this point that there is no relation between Sperry's licensing of its foreign patents and this action for infringement of the United States patents in suit. Defendants also refer to testimony that statements were made by salesmen of Sperry in 1955 to customers of Electro Circuits that the Aluminum Company of America had standardized on Sperry equipment. Defendants assert that such statements were designed to "stampede" customers of Electro Circuits into using Sperry equipment. This testimony was hearsay, and there is no evidence tending to prove that, if made, such statements had any effect on the customers of Electro Circuits. By such testimony defendants seek to establish that in its relations with Electro Circuits Sperry followed a policy of forwarding

improper notices to the trade. They fail in their purpose on two grounds—the testimony is incompetent—and it is entirely lacking in probative value. Defendants also refer to the testimony of Buckman, now with Curtiss-Wright, that while he was enployed by Thompson Products in 1955, Smack, then of Sperry, said to him that the Immerscope could not operate at a certain speed, whereupon Buckman demonstrated that it could. It is difficult to believe that defendants are serious in their claim that this unimportant incident is related to the question of improper trade notices. Buckman's testimony in this regard is entitled to no weight. Defendants also refer to the fact that Farwell expressed the opinion on several occasions that the market for ultrasonics was only large enough for one manufacturer. It is implied that such statements evidence an unlawful monopolistic purpose. The statements were made by Farwell on the occasion of the conference in May 1953 between representatives of Sperry and Electro Circuits. Richards, president of the latter company, testified that Farwell made such statements in explanation of Sperry's policy not to grant licenses because the field was not large enough for two companies. According to Richards, Farwell added that in view of its patents it was Sperry's right "to have exclusive use of the field." I am unable to read any unlawful intent in Farwell's statement of Sperry's purpose to exercise its lawful right to exclude others from using its inventions.

The matters above referred to lend no strength to defendants' major contention that in filing this suit Sperry was motivated by a purpose to enlarge the scope of the monopoly granted by the Patent Office. The facts in the record lead inescapably to the conclusion that Sperry was forced to sue for infringement in order to protect its rights under the patent. Although Sperry served Electro Circuits with a notice of infringement in March 1953, and its agreement of May 1953 to defer action for six months terminated in November of that year, it was not until ten months later, and long after Electro Circuits embarked upon its deliberate program of infringement, that this action was filed. Sperry had done more than make good on its promise to give Electro Circuits ample time to convert to its F-M system and avoid the infringement action. Sperry's conduct, which is now assailed, was regarded quite differently by Electro Circuits when it was promoting the sale of its stock during the period within which it was to convert to the F-M system of flaw detection. In a prospectus filed with the Investment Department of the Division of Corporations of the State of California, on October 6, 1953, ElectroCircuits, among other things, made the following statements:

"There is some question as to whether or not, in the absence of the working agreement mentioned above, the B-scan and wide band converter infringe patents held by Sperry and relating to pulse modulation ultrasonic inspection. To avoid any possible conflict on this matter, the Corporation decided to convert its instruments to phase, frequency or other modulation mode clearly differing from the pulse mode. The Corporation owns United States Patent 2,593,865, directed to frequency modulation system of ultrasonic flaw detection. The patent firms of Hill, Sherman, Meroni, Gross & Simpson of Chicago"—"and Lippincott and Smith of San Francisco, have independently given opinions that conversion of the present pulse modulated instrument to a mode of modulation as described in said patent, will avoid any question of infringement of the Sperry owned patents. The Corporation has recognized for some time the advantages of phase or frequency modulation over pulse modulation, particularly with respect to improved resolution and diversification of applications. The cost of conversion, however, has not been heretofore justified. Sperry has indicated con-

tinued cooperation during the period required for the Corporation to effectuate this conversion."

Sperry's cooperation was given in full measure but ElectroCircuits recanted on its promise to convert and infringed the Sperry patents.

During the period of the so-called "working agreement" ElectroCircuits sold 8 Wide Band Converters while Sperry sold but one Reflectoscope for use with a Wide Band Converter. Both instruments sold for about the same price, and it is obvious that the benefits realized by ElectroCircuits under the arrangement were many times greater than those realized by Sperry. Electrocircuits suffered no loss through any alleged improper conduct of Sperry.

ElectroCircuits relies heavily on Kobe, Inc. v. Dempsey Pump Co., 10 Cir., 198 F.2d 416 as authority supporting its claim that the filing of this suit was an integral part of Sperry's alleged purpose to unlawfully monopolize the pulse echo system of flaw detection. The Kobe case, however, is of no aid to defendants. In the cited case, the Court of Appeals found that in March 1933 Kobe and Rodless Pump Company, competitors in furnishing hydraulic pumps to the oil industry, entered into an agreement which provided that a third corporation, known as Roko, would be created for the purpose of holding title to patents assigned to a pool. The new corporation had no other function than holding the pooled patents, acquiring other patents and granting licenses. Kobe and Rodless assigned all their patents to Roko for a period of 25 years. Subsequently Roko acquired all of the patents covering inventions of hydraulic pumps and Kobe became the sole licensee of Roko.

In 1948 suit was filed by Kobe against Dempsey. At the time of filing Kobe had no concrete information that the Dempsey pump infringed any of Kobe's patents. The court found that upon the filing of the infringement action Kobe sent notices to the trade which were veiled threats that purchasers might be involved. The notices resulted in an al-most complete boycott of the Dempsey pump. In holding that the institution of the infringement action was an integral part of Kobe's unlawful monoply, the court found that the Kobe-Rodless agreement of 1933, which created Roko, was the beginning of an arrangement to corner the hydraulic pump business for oil wells. Among other things, the court said:

"The purposes of the original contract creating the monoply were illustrated by the activities of Kobe when Dempsey appeared on the market and became the definite prospect for competition in the hydraulic field. *Until then there had been no need for Kobe to display its monopolistic power.* A reading of the communications between the company and the sales agents and the testimony as to the activity of different representatives of Kobe can leave no other inference than that the monopolistic purpose of this *original arrangement* was to be continued if possible. This suit was no more than a part of the *original plan* and was designed to nip this competitive threat in the bud." At pages 423–424. (Emphasis supplied.)

As shown by the findings of the Court of Appeals, Kobe's suit against Dempsey was an attempt to maintain and continue in effect the unlawful monopoly created by Kobe's contract with Rodless 15 years before the infringement suit was filed. No comparable situation is to be found in the case at bar. The defendants ignore this basic distinction between the two cases and take no account of the striking contrast between the facts of Kobe and those of the instant case. Accusations and imputations of reprehensible conduct, such as were present in Kobe, are poor substitutes for the missing proof of similar conduct by Sperry. The evidence in this case admits of no other rational conclusion than that Sperry was forced to sue for infringement to protect its lawful rights under its patents. Cole v. Hughes Tool Co., 10 Cir., 215 F.2d 924; United States v.

United Shoe Machinery Corp., D.C., 110 F.Supp. 295; International Visible Systems Corp. v. Remington-Rand, Inc., 6 Cir., 65 F.2d 540.

### Sperry's Foreign Licenses

There can be no doubt that Sperry's primary purpose in entering into foreign license agreements was to obtain income from royalties on its foreign patents. Sperry had attempted for some time to market its products abroad but with little success. It had decided that the limited market abroad did not warrant the substantial investment necessary to establish manufacturing plants in foreign countries. Some of the European countries impose taxes on patents, particularly those covering inventions not used commercially. Sperry's foreign patents were therefore a source of continuing and increasing expense and were producing little or no income. In an effort to correct and improve this unprofitable condition, Sperry entered into an exclusive license agreement with Refac in March 1954. Sperry has no financial interest in Refac, which is an independent organization specializing in assisting American corporations in the handling of their foreign business. The original license was amended in September 1955 to separate those patents in which Dr. Firestone has an interest and Sperry's other patents. The term of the amended license was for 5 years and Refac was granted the right to terminate the agreement at any time upon 6 months' notice. Refac was authorized to sub-license others, with Sperry's approval, in consideration of the payment of royalties, part of which were to be retained by Refac and the balance remitted to Sperry. Refac negotiated and executed 13 sublicenses with 12 European companies and one with TKS of Tokyo, Japan. Eleven of such licenses are in effect and, with the exception of the license to TKS, all of such licenses are non-exclusive. The sub-licensees are authorized to manufacture and sell the devices and accessories covered by the patents in specified territories. The territory of several of the licensees extends into countries in which Sperry has no patent rights. There was also an overlapping of territories in many of the licenses. In addition to the payment of royalties, the licensees were required to acknowledge the validity of Sperry's foreign patents, both present and future, and to agree not to contest the validity of such patents or future applications. In six of the licenses provision is made for "grant backs" of improvements and an exchange of technical knowledge and know-how. Three of such licenses contain agreements by Sperry not to engage in manufacturing in Europe. The terms of the licenses vary in respect of termination rights. Some of the licensees were granted the right to cancel their agreements in 1957, others in 1958, and still others in 1963 and 1965. The original exclusive license to TKS contained a provision requiring the licensee not to manufacture or sell ultrasonic equipment for a period of five years after the termination of the license no matter which party caused the termination. This provision was modified by an amendment on November 20, 1957. The amendment limited the scope of the obligation of TKS not to engage in the manufacture or sale of ultrasonics after termination of the license by excepting therefrom the manufacture and sale of such inventions as "shall have become public knowledge by publication or patenting within the licensed area."

In discussing defendants' contentions in respect of the foreign licenses, the claims of antitrust violation in the counterclaim of ElectroCircuits will be separated from the claim of both defendants that the patents in suit were misused.

To make out a case of antitrust violation, the counterclaiming defendant must show that Sperry's foreign licenses had a direct and substantially harmful effect on interstate commerce or on the foreign commerce of the United States. Defendant ElectroCircuits contends that "the primary purpose of Sperry's foreign licensing policy was to reserve to Sperry the American market." In support of this contention the defend-

ant asserts that Sperry has obtained almost all patents owned by foreign manufacturers most likely to compete with it in the United States markets. Defendant, however, takes no account of the actual number of patents received by Sperry or their value. The fact is that Sperry has received very little by way of assignments from its foreign licensees. Of the 10 assigned applications from Krautkramer, of Germany, 6 have been abandoned, 2 others are about to be abandoned and only one claim has been allowed on the 2 remaining applications. Sperry has also received rights under 6 patents from A.C.E.C. of Belgium, but these relate to various types of transducers and are of doubtful value. No assignment of any application or patent covering ultrasonic pulse echo apparatus has been received. It is the teaching of Transparent-Wrap Machine Corp. v. Stokes & Smith Co., 329 U.S. 637, 67 S. Ct. 610, 616, 91 L.Ed. 563, that "The inclusion in a license of a condition requiring the licensee to assign improvements is not per se illegal and unenforceable." See also Hartford Empire Co. v. United States, 323 U.S. 386, 422, 423, 65 S.Ct. 373, 89 L.Ed. 322. Where a challenged practice is not per se illegal, an examination of all relevant market factors and their economic consequences is required to determine whether the assailed practice is within the ban of the Sherman Act. Defendant has insisted throughout that the relevant market here is that of ultrasonic pulse echo testing instruments. Yet it is not shown whether the applications and patents received by Sperry from its licensees are competitive or merely complementary, nor has it been established that there has been any illegal acquisition of patent rights from the licensees. Moreover, no attempt has been made to show any adverse economic consequences arising from the "grant backs." Defendant also contends that the foreign licenses have had a harmful effect on the import trade of the United States. In support of such contention defendants point to a few instances where corporations in the United States were unable to buy pulse echo equipment from Krautkramer, one of Sperry's foreign licensees. However, the most reasonable inference to be drawn from the evidence is that such purchases were prevented by Sperry's lawful exercise of its rights under its United States patents and Krautkramer's unwillingness to infringe such patents. It is not claimed that any other purchases from abroad were prevented by Sperry's foreign licenses. That such licenses were without effect on this country's import trade is indicated by the fact that Kelvin Hughes and Glass Developments, two large English corporations who are competitors and not licensed under the Sperry foreign patents, do not sell ultrasonic devices in the United States. It also appears that none of the foreign licensees did business in the United States prior to the time they were licensed under Sperry's foreign patents. The conclusion is inescapable that the inability of a few American corporations to buy pulse echo equipment from Krautkramer was due to Sperry's ownership of the United States patents on such equipment and its exercise of its lawful right to exclude others from selling such equipment in this country.

In an effort to show that the export trade of the United States was harmed by the foreign licenses defendants assert that in order to obtain concessions from its licensees Sperry agreed not to compete in certain areas of the world. There are no such express agreements with the licensees. It is true that Sperry agreed with three of its licensees not to manufacture in Europe. However, it is shown that since such license agreements were executed Sperry's export trade has increased. While some of Sperry's export shipments were made to countries where it has no foreign patents, such countries are within the territories assigned to the licensees with whom such agreements were made. Sperry's freedom to export American manufactured products has not been restricted. There is no evidence tending to show that the export trade of Sperry, or any one else, including Elec-

trocircuits, has been injuriously affected by the foreign licenses. Sperry has granted a license to T.K.S. In effect this was an assignment of its patent rights in Japan to the licensee. There is no evidence showing that such license had any detrimental effect on this country's export trade.

Defendant also attacks the legality of practically all of the other restrictive covenants in the foreign licenses but offers no evidence to show that any or all of such covenants had any harmful effect on the foreign or domestic commerce of the United States. It is unnecessary, therefore, to extend this discussion to a consideration of the various claims of the defendant in this regard. Defendant has failed to prove any public injury resulting from Sperry's foreign licensing policy. There is also a complete failure of proof that the foreign licenses have caused any injury to the counterclaiming defendant. The real question on this branch of the case, therefore, is whether ElectroCircuits has any right of action under the antitrust laws.

The Counterclaim of ElectroCircuits

Section 15 of Title 15 U.S.C.A., in its pertinent part, reads:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States * * * and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

The courts have held uniformly that it is a prerequisite to the maintenance of an action under the antitrust laws by a private suitor that the plaintiff prove that he was damaged as a direct result of defendant's violation of the Sherman Act. Conference of Studio Unions v. Loew's, Inc., 9 Cir., 193 F.2d 51; Productive Inventions, Inc. v. Trico Products Corp., 2 Cir., 224 F.2d 678; Hunter Douglas Corp. v. Lando Products, 9 Cir., 235 F.2d 631; E. V. Prentice Machinery Co. v. Associated Plywood Mills, Inc., 9 Cir., 252 F.2d 473; Peller v. International Boxing Club, 7 Cir., 227 F.2d 593; Mason City Tent & Awning Co. v. Clapper, D.C., 144 F.Supp. 754. The principle which governs in all private suits under the statutes applies with equal force to alleged violations of the antitrust laws asserted by a counterclaiming defendant. In order to maintain its counterclaim it is therefore incumbent upon the defendant to show that it has been injured in its "business or property" by the wrongful acts of Sperry. This, the counterclaiming defendant has failed to do. As already shown, there is no evidence of any antitrust violation by Sperry in the conduct of its business in the United States. It is clear that in respect of all its acts and practices in this country Sperry was acting within the ambit of its lawful monopoly under the patents in suit. The defendant contends, however, that it sustained damage as a result of Sperry's alleged practice of requiring each purchaser of a Wide Band Converter to buy a Sperry Reflectoscope. This argument is based upon a false premise. Sperry did not require any purchaser of a Wide Band Converter to buy a Reflectoscope. It was ElectroCircuits who insisted that the purchasers of its Wide Band Converters use them only in connection with a Reflectoscope in order to avoid infringing the Sperry patents. In all but one of the sales made under the "working agreement" ElectroCircuits sold its equipment to customers who already owned Reflectoscopes. One Reflectoscope was sold to the du Pont Company with permission to use it in conjunction with a Wide Band Converter but no other sales of Reflectoscopes were made for the same purpose. Moreover, ElectroCircuits never purchased any Reflectoscopes and its claim of damages as a result of the "working agreement" between the parties is entirely devoid of merit.

Defendant also contends that it was damaged by reason of expenses incurred in investigating the validity of the

Sperry patents; that it sustained further damage in the expenditure of time and capital in an effort to design devices that would avoid Sperry's patent claims even though it considered the validity of such claims to be questionable. However, these alleged injuries were self-inflicted and are in no way attributable to any wrongful act of Sperry. Defendant contends further that it sustained a loss of profits by reason of this suit for infringement because of its inability to offer satisfactory indemnity agreements to its potential customers prior to the time the Curtiss-Wright Corporation agreed to underwrite the expense of defending this suit. Also claimed as an item of damage is the alleged loss of profits resulting from defendants' agreement with Curtiss-Wright. These contentions represent no more than claims for damages resulting from the suit for infringement. They rest upon the erroneous presupposition that Sperry's action in filing suit was in the furtherance of an unlawful monopoly. This is contrary to the fact determined above that Sperry was forced to institute suit to protect its lawful rights under the grants from the Patent Office. To justify such claims for damage defendant again seeks to assimilate the facts of Kobe, Inc. v. Dempsey Pump Co., supra, to the facts of this case, but, as already shown, there is no parallel between that case and the facts of this one. Defendant also cites and relies upon the following statement of the court in Bigelow v. RKO Radio Pictures, 327 U.S. 251, 265, 266, 66 S.Ct. 574, 580, 90 L.Ed. 652:

> " 'The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. * * * The constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery for a proper invasion of the plaintiff's rights."

The quotation from Bigelow is unquestionably a correct statement of the law but it has no application here. Defendant has not shown any invasion of its rights by any wrongful act of Sperry. Defendant embarked upon a deliberate program of infringement by manufacturing and selling Immerscopes in full knowledge that it was risking, if not inviting, a suit for infringement. This Court has found that defendants did infringe the Sperry patents. It would be a strange paradox indeed if Electro Circuits were permitted to escape the consequences of its own tortious conduct and recover damages from Sperry, who was merely asserting its lawful rights under its patents.

Electro Circuits has also failed to establish any damage to itself or its property directly resulting from Sperry's licensing of its foreign patents. The only testimony offered by Electro Circuits in this connection is that of its president, Richards, who testified his company had signed a contract with a foreign sales representative in San Francisco but did not aggressively attempt to sell abroad until 1954; that such efforts were discontinued on November 17, 1955 without any foreign sales being made. There was not the slightest suggestion by the witness that Sperry's licensing policy abroad had any effect whatever on Electro Circuits' failure to sell in foreign markets. The reasons for its lack of success in this field are unstated by the defendant and unknown to the Court. It is clear, however, that there is no showing of a causal relation, either proximate or remote, between Electro Circuits' failure to make sales abroad and Sperry's licensing policy in foreign countries. The record is barren of any proof that Sperry's licensing policy abroad or its acts and practices in the operation of its business in this country resulted in any pecuniary injury to the counterclaiming defendant.

For the reasons indicated, it is held that Electro Circuits is not entitled to maintain its counterclaim, and that the same must be dismissed.

### 940

#### Alleged Misuse of the Patents in Suit

■ This issue may be disposed of with brief comment. By specific findings this Court has held that Sperry did not misuse the patents in suit in any of its acts or practices of which defendants complain that relate to the conduct of Sperry's business in the United States. Such findings are hereby reaffirmed. All of Sperry's foreign licenses were granted under its foreign patents. Hence there was no use, and consequently no misuse, of the United States patents in suit in connection with Sperry's foreign licensing policy. Defendants recognize that the defense of misuse is available only where there has been a misuse of the patents in suit. However, they attempt to relate Sperry's United States patents to its foreign licensing policy. Defendants advance the argument that Sperry's rights under the patents in suit were expanded by its foreign patents covering the same inventions and that Sperry used its foreign patents to expand its rights under its United States patents "beyond anything contemplated by law." The implication of such argument seems to be that the patents in suit as expanded by the foreign patents covering the same inventions were misused by Sperry in connection with its foreign licensing policy. The argument is unsound. Foreign patents create rights separate and distinct from those created by patents issued in the United States. Foreign patents covering the same inventions as United States patents can neither restrict nor enlarge the rights acquired under patents issued by the United States Government. An excellent statement of the applicable principles is found in the Report of the Attorney General's Committee on Antitrust Laws (1955) where it is said (p. 96):

> "We point out, however, that a patent is a grant from the sovereign and therefore has no force beyond that sovereign's territorial limits. Thus, a United States patent creates rights coextensive only with United States laws. Similarly, a British patent, covering the same invention

as an American patent, is governed by British law co-extensive with British territory. This means that patent rights in the same invention may differ in scope and effect in the respective territorial limits of the country of issuance."

■ The doctrine of misuse rests upon the principle that the holder of an exclusive privilege granted in the furtherance of public policy may not claim protection of his grant by the courts where it is being used to subvert that policy. Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 494, 62 S.Ct. 402, 86 L.Ed. 363. Sperry seeks no protection of the patents granted by foreign countries and it is not shown that the patents in suit were used to subvert the public policy of the United States as expressed in the Constitution and patent laws.

An order may be entered dismissing the counterclaim of the defendant Electro Circuits and granting plaintiffs the injunctive relief and the accounting prayed for in their amended and supplemental complaint.

This opinion constitutes Findings of Fact and Conclusions of Law pursuant to Fed.Rules Civ.Proc. Rule 52(a), 28 U.S.C.A.